702 F.2d 221
 25 Fair Empl.Prac.Cas. 837,
25 Empl. Prac. Dec. P 31,706, 226 U.S.App.D.C. 242
 Earl REYNOLDS, et al., Appellees,
v.
SHEET METAL WORKERS, LOCAL 102, Sheet Metal and
Air-Conditioning Contractors National Association, Joint
Apprenticeship Committee for Sheet Metal Workers, Local 102,
Sheet Metal Workers International Association, et al., Appellants.
 No. 80-1378.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 19, 1981.
Decided March 31, 1981.
 
 Appeal from the United States District Court for the District of Columbia (D.C.Civil No. 75-0778).
 William P. Dale, Washington, D.C., with whom Thomas P. McErlean and Patrick J. Ogden, Jr., Washington, D.C., were on the brief, for appellants.
 Martin D. Schneiderman and Seth Goldberg, Washington, D.C., with whom John D. Alkire and Stephen L. Spitz, Washington, D.C., were on the brief, for appellees. Richard T. Seymour, Washington, D.C., also entered an appearance for appellees.
 Before WILKEY and MIKVA, Circuit Judges, and JAMES F. GORDON*, Senior Judge, United States District Court for the Western District of Kentucky.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 This is an appeal from a preliminary injunction entered in a class action alleging wide-spread discrimination against blacks in the union sheet metal trade in the metropolitan Washington, D.C. area. The appellants were enjoined from relying on apprentice selection criteria that, according to appellees, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e to 2000e-17 (1976). Finding that the district court did not abuse its discretion in issuing the preliminary injunction, and that it did not lack jurisdiction over the case presented, we affirm.
 
 I. PROCEDURAL POSTURE
 
 2
 The appellees are black would-be sheet metal workers, representing a class of "black persons who have been or may be excluded from membership in Sheet Metal Workers Local 102 because of their race."[1] They allege both intentionally discriminatory actions and employment practices with racially disproportionate impact, resulting in the exclusion of black workers from journeyman status and membership in the union.
 
 
 3
 Some of appellees' allegations center on an apprenticeship program administered by appellant Joint Apprenticeship Committee, pursuant to a collective bargaining agreement between appellant Sheet Metal Workers Local 102 and appellant Sheet Metal and Air-Conditioning Contractors National Association, Washington, D.C. Chapter, Inc. (hereinafter denominated collectively as JAC). JAC operates a four-year apprenticeship program designed to train individuals to become journeymen sheet metal workers. In addition, at one time JAC ran a "preapprentice" program for minority workers only; the district court found that preapprentices received no training, and that the program "was initiated as a means of increasing the number of minorities counted as sheet metal workers in order to meet government contract requirements." Reynolds v. Sheet Metal Workers Local 102, 498 F.Supp. 952, 958-59 (D.D.C.1980). This program was abandoned in late 1974. Id.
 
 
 4
 The preliminary injunction involved in the present appeal prohibits selection of new apprentices on the basis of certain criteria that JAC has historically used. JAC had required apprenticeship applicants to provide a high school transcript, to present a high school diploma or the equivalent, to answer questions about arrest records, and to submit to a subjectively graded personal interview. The appellees claim that these criteria are not job-related, and that they result in a disproportionate exclusion of blacks from the apprenticeship program, and thereby from the union, in violation of Title VII. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The district court concluded that appellees had successfully presented a prima facie case that the selection procedure was unlawful, and that JAC had failed to rebut that showing and appeared unlikely to do so at trial. 498 F.Supp. at 974.
 
 
 5
 JAC has exercised the right to an interlocutory appeal from the preliminary injunction, as afforded by 28 U.S.C. Sec. 1292(a)(1) (1976). It is well settled that preliminary relief is within the sound discretion of the trial court, and that an appellate court will not reverse such a grant of relief unless the district court lacked jurisdiction over the controversy, or abused its discretion, or based its grant on an error of law. Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1941); Delaware & Hudson Ry. Co. v. United Transportation Union, 450 F.2d 603 (D.C.Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971); 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE Sec. 2962 (1973). The trial court's discretion is to be exercised in accordance with the traditional equitable standard:
 
 
 6
 The movant must show a substantial likelihood of success on the merits, and that irreparable harm would flow from the denial of an injunction. In addition, the trial judge must consider the inconvenience that an injunction would cause the opposing party, and must weigh the public interest as well.
 
 
 7
 A Quaker Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C.Cir.1969). The district court cited this standard as the basis of its decision. 498 F.Supp. at 974-75 (citing Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C.Cir.1977)).
 
 
 8
 II. THE DISTRICT COURT DID NOT LACK JURISDICTION
 
 
 9
 JAC argues on appeal that the district court lacked jurisdiction to grant the preliminary injunction because it did not possess subject matter jurisdiction over the underlying controversy. This would indeed be a serious defect, entirely vitiating the court's action, and robbing this court as well of jurisdiction to do anything other than reverse and remand with instructions to dismiss. Federal courts are courts of limited jurisdiction, and are obliged always to ascertain whether they have subject matter jurisdiction over the litigation before them, even when the parties prefer to ignore the question. Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884). We conclude, however, that JAC's attacks on the jurisdiction of the district court are baseless, and reflect a misapprehension of the nature of class action litigation and of the timely filing requirements of Title VII.
 
 
 10
 JAC's argument focuses on the facts surrounding the filing of the present suit by the six named plaintiffs whom the district court has empowered to represent the class. Four of the named plaintiffs were forced into the preapprenticeship program before they were permitted to become apprentices, while a fifth entered the apprenticeship program directly. All five were subsequently dropped before completing the program. The sixth named plaintiff finished his apprenticeship and became a journeyman member of the union; his claims concern discriminatory practices not related to the present appeal.
 
 
 11
 JAC insists that these plaintiffs are not proper class representatives in an action challenging admission standards for the apprenticeship program. JAC asserts that any complaint these individuals may have about apprenticeship selection was first voiced too long after they had already been admitted to the program to be timely under Title VII precedents. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).
 
 
 12
 Appellees respond that JAC's challenges to the propriety of their representation are unfounded, and that they are perfectly well qualified to act on behalf of their class. Their complaint charges a continuum of intentional and unintentional discrimination extending through the various stages of the sheet metal trade. Five of the six named plaintiffs challenge a system of barriers excluding blacks from journeyman membership in the union; even those blacks who finally make it into the apprenticeship program may succumb to discriminatory practices within that program, and be dropped before reaching the goal of journeyman status. If these charges are proven at trial, all five may be appropriate class representatives. Furthermore, four of the five were diverted into the preapprenticeship program, and the timeliness of claims based on that diversion depends upon the resolution of factual and legal disagreements yet to be confronted by the district court.
 
 
 13
 Regardless of the ultimate resolution of these contentions, it is clear that they present substantial issues for decision. We are satisfied that none of the uncertainties JAC raises impugns the subject matter jurisdiction of the district court.
 
 
 14
 It is true that "the Supreme Court and this court--like most others--have referred to the timely-filing requirement as a jurisdictional prerequisite" to a Title VII suit, Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 474 (D.C.Cir.1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), as JAC points out. It is equally true, however, that this court has explicitly held that, loose use of language notwithstanding, "timely filing with the [EEOC] is not a jurisdictional step but is to be analogized to a statute of limitations." Id. at 474; Bethel v. Jefferson, 589 F.2d 631, 641 n. 64 (D.C.Cir.1978). Untimely filing is a defense that must be asserted and adjudicated; a defendant can be estopped by his failure to raise it, see Laffey, 567 F.2d at 476, and equitable considerations may toll the time limit, see Bethel, 589 F.2d at 642-43.
 
 
 15
 Statute of limitations defenses may affect the success of a plaintiff's claim for relief, but they do not deprive a court of subject matter jurisdiction. Jurisdiction is not to be equated with ultimate success on the merits. "Jurisdiction is authority to decide the case either way. Unsuccessful as well as successful suits may be brought .... [I]f the plaintiff really makes a substantial claim under an act of Congress there is jurisdiction whether the claim ultimately be held good or bad." The Fair v. Kohler Die and Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913) (Holmes, J.); see Hagans v. Lavine, 415 U.S. 528, 536-43, 94 S.Ct. 1372, 1378-82, 39 L.Ed.2d 577 (1974).
 
 
 16
 Similarly, JAC's claim that the district court erred in its class certification decision does not go to the court's subject matter jurisdiction. A case or controversy can still exist between a class and its adversary when the court has authorized an inappropriate representative. "When the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [the representative]." Sosna v. Iowa, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975); see Franks v. Bowman Transportation Co., 424 U.S. 747, 752-57, 96 S.Ct. 1251, 1258-60, 47 L.Ed.2d 444 (1976) (adversary relationship between class and defendant continues despite mooting of named plaintiff's claim in Title VII case).
 
 
 17
 Thus, JAC's fundamental attacks on the district court's power to issue the preliminary injunction are considerably overstated. JAC has identified a defense that, as the facts develop at trial, may or may not prove meritorious, and has raised some legal questions under rule 23 of the Federal Rules of Civil Procedure. These issues are debatable, and do not deprive appellees' suit of all substantiality. The district court's jurisdiction over the subject matter of this case is apparent.
 
 
 18
 III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
 
 
 19
 A brief review of the record demonstrates that the district court's discretion in issuing the preliminary injunction was guided by the traditional factors, and was not clearly abused. The court satisfied itself that the appellees had a substantial likelihood of success on the merits, that they were faced with irreparable injury, and that neither the public interest nor the magnitude of inconvenience weighed against granting relief.
 
 
 20
 The district court concluded, on the basis of four different sources of evidence, that the appellees could establish a prima facie case that JAC's apprentice selection procedures had the racially disparate impact condemned by Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The court looked first to actual applicant flow statistics. These tended to show that black applicants were turned away at a higher rate than whites. The clarity of this evidence was undermined, however, by JAC's peculiar recordkeeping practices; whites who inquired about the apprenticeship program were not recorded unless they completed an application form or a similar document, while many blacks who were interested in apprenticeship were diverted into the preapprenticeship program, which was copiously documented, 498 F.Supp. at 959. Thus comparison could not be made between two precisely analogous groups. The district court therefore sought corroboration in other empirical evidence.
 
 
 21
 The appellees presented two distinct reconstructions of the pool of applicants on which the sheet metal apprentice system draws. One was based on the previous occupations listed by actual apprentice applicants, and the other was defined in terms of the educational levels typically attained by actual sheet metal workers. Both sets of statistics confirmed the suspicion that JAC's selection procedures disproportionately eliminated black applicants. 498 F.Supp. at 967. Finally, the district court took note of more general evidence that the challenged criteria were of a kind that could be expected to disqualify blacks. Putting all these factors together, the court concluded that the plaintiffs had demonstrated a strong likelihood of success in their prima facie case at trial.
 
 
 22
 Once a satisfactory statistical showing of disparate impact has been made, the burden falls on the employer to demonstrate the job-relatedness of his criteria. JAC attempted to validate only one of the challenged selection criteria, the high school diploma. The court found the expert's "construct validation"[2] unreliable, both in the method chosen and in its empirical analysis. 498 F.Supp. at 972. The court concluded that JAC was unlikely to carry the burden of establishing the affirmative defense at trial.
 
 
 23
 The class certification arguments that JAC viewed as undercutting the district court's jurisdiction are more properly characterized as potential clouds on appellees' chances of success on the merits. In this indirect way, they enter into our analysis. These issues may be resolved on the basis appellees have urged here, or they may prompt other actions by the district court: class certification problems are constantly subject to reconsideration as the facts develop at trial. Even if the district court ultimately holds that the initial class certification was defective, modification of the class will not necessarily free JAC from liability.[3] This court does not need to resolve such intricacies on an interlocutory appeal. "[A] district court's order denying or granting class status is inherently tentative," and in fact this is one of the principal reasons why such orders are not, in themselves, appealable. Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 2458 n. 11, 57 L.Ed.2d 351 (1978). Our task in reviewing a preliminary injunction is merely to determine that the district court could reasonably find a substantial likelihood of appellees' success on the merits.[4] Giving that court's findings of fact the deference to which they are entitled, we believe the court could reasonably conclude that appellees had made the requisite showing.
 
 
 24
 The district court also found that all the other factors traditionally considered in evaluating the propriety of a preliminary injunction weighed in favor of the plaintiffs. Continued selection of apprentices on a discriminatory basis would irreparably injure class members by denying them training and delaying their entry into the trade. The court found that admission of new apprentices varied with the economic condition of the sheet metal industry; in 1977, no apprentices had been taken, and in 1978 only eight, while fifty-five were admitted in 1979, and thirty to fifty positions were contemplated for the new class. 498 F.Supp. at 959. The uncertainty of future opportunities emphasizes the irreparable character of the injury class members would sustain if discriminatory selection were permitted. See, e.g., Firefighters Institute for Racial Equality v. City of St. Louis, 616 F.2d 350, 362 n. 21 (8th Cir.1980), petition for cert. filed, 49 U.S.L.W. 3014 (U.S. July 8, 1980) (No. 80-29).
 
 
 25
 Similarly, the inconvenience posed by the need to formulate a nondiscriminatory selection procedure is minimal. The district court recognized JAC's educational needs, and left JAC "considerable leeway in devising new selection criteria." 498 F.Supp. at 975. The public interest is clearly furthered by remedying racial injustice, and JAC's training and supervision preclude any danger to the public from unqualified sheet metal apprentices. Thus, the district court could reasonably find that all the customary factors favored the granting of a preliminary injunction.
 
 IV. CONCLUSION
 
 26
 The traditions of equity grant a trial court substantial discretion to determine whether the status quo should be maintained to prevent irreparable injury to litigants pending final adjudication of a case on the merits. Appellate scrutiny of the resulting determination is correspondingly limited in scope. On the record before us, given the district court's findings of fact and its statement of reasons for its action, we see no absence of jurisdiction or abuse of discretion. The district court should proceed to a final resolution of the dispute on the merits. The underlying questions that JAC has raised here may be presented to the trial court, and will be open to review on the merits after a final judgment. On this interlocutory appeal, the order granting the preliminary injunction is
 
 
 27
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 More precisely, the district court determined that the action could be
 maintained as a class action under F.R.C.P. 23(b)(2), on behalf of the following three subclasses:
 (1) All black persons who have been or may be excluded from membership in Sheet Metal Workers Local 102 because of their race; and
 (2) All black persons who have been or may be denied employment in the sheet metal trade in the Metropolitan Washington area by defendants because of their race; and
 (3) All black persons who have been, are now or may be employed in the sheet metal trade in the Metropolitan Washington area and who have been or may be adversely affected in their terms and conditions of employment, including work assignment and job classification, by reason of the defendants' racially discriminatory practices.
 Reynolds v. Sheet Metal Workers Local 102, Civ. No. 75-0778, memorandum and order (D.D.C. Mar. 24, 1976).
 
 
 [2]
 This court discussed the prevailing techniques for validating selection procedures in Douglas v. Hampton, 512 F.2d 976, 984-87 (D.C.Cir.1975), and held that "construct" validation was only acceptable when the preferred method of "empirical" or "criterion" validation had been shown to be infeasible. The district court in Reynolds noted that no such showing had been made, but went on to conclude that even if "construct" validation were permissible, the validation presented in this case "cannot withstand careful scrutiny." 498 F.Supp. at 972
 
 
 [3]
 In the years since this suit was first filed, JAC has continued to rely on the challenged admission criteria, and applicants rejected in 1979 testified at the injunction hearing. The district court might conclude that the class should be broken into further subclasses, or that more recent applicants whose standing is unquestioned may intervene as named plaintiffs. See McCarthy v. Kleindienst, 562 F.2d 1269 (D.C.Cir.1977)
 
 
 [4]
 Appellants persistently claim that their burden in fending off a preliminary injunction is only to "come forward with some evidence tending to support a defense," citing Dendy v. Washington Hospital Center, 581 F.2d 990 (D.C.Cir.1978). But in Dendy, the issue was the lawfulness under Title VII of an examination testing respiratory therapists on their clinical knowledge. The court observed that "[t]he critical nature of the work of the therapists and the grave condition of their patients also bears on the public interest issue that is material on a motion for the relief that is to be accorded pending the determination of the litigation." Id. at 993. Only where the balance of injury and the public interest weigh so heavily in favor of the party opposing an injunction is his burden of coming forward with evidence so light