Frank KUEHNER, Dorothy Burayak, Richard Burns, Alice Hetherington, Frank Jennings, Jr., Philip Fisher, Clinton Foyal, Solomon Katz, Raymond Staniewicz, James Loughlin, Margaret Douglas, Lawrence Cook, Steven Sverdlow, Elaine Fleigelman, James Mc Keown, and Riva Yanovskaya, on Behalf of themselves and all others similarly situated, Appellees,

v.

Margaret M. HECKLER, Secretary, U.S. Department of Health and Human Services, John A. Svahn, Commissioner, Social Security Administration, Barry Stern, Secretary, Pennsylvania Department of Labor & Industry, John Delpaine, Director, Pennsylvania Disability Determination Bureau.

Appeal of Margaret M. HECKLER, Secretary of the United States Department of Health and Human Services (HHS).

No. 85–1227.

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1985.

Decided Dec. 9, 1985.

Jonathan M. Stein (Argued), Richard Weishaupt, James Lafferty, Community Legal Services, Philadelphia, Pa., Michael L. Harvey, Office of Atty. Gen., Harrisburg, Pa., for appellees.

Edward S.G. Dennis, Jr., U.S. Atty., Susan Dein Bricklin, Asst. U.S. Atty., Philadelphia, Pa., Richard K. Willard, Acting Asst. Atty. Gen., William Kanter, Margaret E. Clark, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., Frank A. Rosenfeld (Argued), for appellant.

Before GARTH, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

EDWARD R. BECKER, Circuit Judge.

In April 1981, plaintiff Frank Kuehner and a number of other Pennsylvania citizens filed a civil action in the district court for the Eastern District of Pennsylvania on behalf of themselves and a class consisting of all Pennsylvania residents whose disability benefits had been terminated or threatened with termination by the Social Security Administration. The gravamen of plaintiffs' complaint was that their benefits had been unfairly terminated because the Social Security Administration had used an improper and unduly harsh "current evidence" standard to determine that they were ineligible for benefits. Plaintiffs sought injunctive relief and mandatory application of a more lenient "medical improvement" standard. In the midst of a protracted legal battle, Congress passed the Social Security Benefit Reform Act of 1984 which directs the Social Security Administration to use the medical improvement standard urged by the plaintiffs and provides that the cases of members of the plaintiff class be remanded to the Social Security Administration for reevaluation in accordance with the new standard.

The issue we decide today is whether the plaintiff class can include those whose grievances arose as long ago as June 1, 1976, the date on which the Social Security Administration surreptitiously adopted the "current evidence" standard, or whether 42 U.S.C. § 405(g) (1982), which gives aggrieved claimants sixty days to commence civil actions challenging termination decisions, limits the class to those whose benefits were terminated since February 28, 1982, sixty days prior to its commencement of the action. Because we find that the Social Security Benefit Reform Act makes the sixty-day limitation of § 405(g) inapplicable to the plaintiff class,[1] we affirm the judg-

---

**1.** There is some dispute about whether the sixty-    day requirement of § 405(g) is a jurisdictional

ment of the court below which held that the class included those persons whose benefits were cut off after June 1, 1976.[2]

## I. BACKGROUND

### A. *The Statutory Background Before 1984*

1. *The Standard for the Review of the Termination of Disability Benefits: Medical Improvement or Current Evidence*

Among the myriad benefits programs administered by the Social Security Administration (SSA) are the Social Security Disability Insurance program (SSDI), 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income for the Aged, Blind, and Disabled (SSI), 42 U.S.C. §§ 1381 *et seq.* Under each of the programs, a controversy developed in the late 1970's and 1980's about what the SSA was required to demonstrate to terminate a recipient's benefits. There were two contending standards. The first, the "medical improvement standard," required the SSA examiner to determine whether the disability for which the recipient had originally been granted benefits had improved sufficiently to allow the

recipient to return to work. The second standard, the "current evidence standard," allowed the SSA examiner effectively to reopen the question of disability and consider anew whether the recipient should ever have received disability benefits. The difference between the medical improvement standard and the current evidence standard is analogous to that between deferential and *de novo* judicial review. The current evidence standard makes it much easier than the medical improvement standard to terminate benefits; hence, the choice of standard can make a significant difference to benefit recipients, especially in close cases.

Until June 1, 1976, the SSA used the medical improvement standard. On that date, however, the Secretary of Health, Education and Welfare (now Health and Human Services) instructed all administrators of SSDI and SSI to use the current evidence standard rather than the medical improvement standard. Although this was a distinct and significant change in SSA practice, the change was not effected through standard notice and comment procedure announced in the Federal Register as mandated by the Administrative Proce-

requirement or a statute of limitations. This distinction is significant because if the time limit is a statute of limitations, it can be waived by the Secretary or in certain cases by the court; if it is jurisdictional, however, it can be waived by neither the parties nor the court. Although some courts of appeals have held that it is a statute of limitations, *see City of New York v. Heckler*, 742 F.2d 729, 737–38 (2d Cir.1984), *cert. granted*, —— U.S. ——, 106 S.Ct. 57, 88 L.Ed.2d 46 (1985); *Lopez v. Heckler*, 725 F.2d 1489, 1505 (9th Cir.1984); *Mental Health Association of Minnesota v. Heckler*, 720 F.2d 965, 973 n. 19 (8th Cir.1983), and the Supreme Court has suggested as much. *Mathews v. Eldridge*, 424 U.S. 319, 328 n. 9, 96 S.Ct. 893, 899 n. 9, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 763–64, 95 S.Ct. 2457, 2465–66, 45 L.Ed.2d 522 (1975), the Supreme Court has not ruled authoritatively on it and the issue is not free from doubt, *see Heckler v. Lopez*, 464 U.S. 879, 881–82, 104 S.Ct. 221, 224, 78 L.Ed.2d 217 (1983) (Stevens, J., dissenting in part) (Court denied motion to vacate a stay ordered by Rehnquist, J., acting as a Circuit Justice; Justice Stevens, concurring in part and dissenting in part, declined to find waiver of the sixty-day requirement, although the Secretary had not raised the issue below); *City of New*

*York, supra,* 742 F.2d at 737 ("[w]e acknowledge that the Supreme Court's position on whether the 60-day provision is jurisdictional is not free from doubt"). The Supreme Court has recently granted certiorari on a case in which one of the questions is whether the sixty-day time limit of § 405(g) may be waived, *see City of New York, supra,* and so the question may be resolved in that case.

The characterization of the time limit is not relevant in this case because of our holding that the Social Security Disability Benefit Reform Act is a congressional statement that § 405(g) simply does not apply to suits brought under § 2(d)(3). Therefore, we will refer to § 405(g)'s sixty-day provision simply as a "time limitation" or "time requirement" and not commit ourselves to either characterization.

**2.** Plaintiffs also allege that even if the Social Security Disability Benefits Reform Act does limit the class, the excluded individuals may seek relief under the mandamus statute, 28 U.S.C. § 1361 (1982). Because we find for the plaintiffs on the first point, we do not address the mandamus claim.

dure Act, 5 U.S.C. § 553. Instead, the Secretary simply sent amendments of the operating guidelines to the state and federal agencies that administered the SSDI and SSI programs.[3] The changes were effected, therefore, without the knowledge of the public.

The SSA continued to use the current evidence standard without public announcement until July 3, 1979 when it announced several proposed rules in the Federal Register. 44 Fed.Reg. 38,879 (July 3, 1979). Among the proposed changes was a switch from the medical improvement standard—which had prevailed *de jure* if not *de facto* —to the current evidence standard. *Id.* at 38, 882. The announcement admitted that the SSA had been using the standard it was only now proposing for "[a]bout two [sic] years." *Id.* at 38,882. The final rules were promulgated on August 20, 1980, 45 Fed.Reg. 55,566 (August 20, 1980),[4] and codified in 20 C.F.R. §§ 404.1501–.1598 and various other sections. The official adoption of the current evidence standard for the medical improvement standard was codified in 20 C.F.R. §§ 404.1579, 404.1594, and 416.994.

Suits were brought in several circuits challenging the SSA's shift from the medical improvement standard to the current evidence standard. Several circuits, including our own, held that SSA was bound by the Social Security Act to use some form of the medical improvement test. *See Haynes v. Secretary of Health and Human Services*, 734 F.2d 284, 287–88 (6th Cir.1984); *Dotson v. Schweiker*, 719 F.2d 80, 82 (4th Cir.1983); *Kuzmin v. Schweiker*, 714 F.2d 1233, 1237 (3d Cir.1983) ("in a termination proceeding, once the claimant has introduced evidence that his or her condition remains essentially the same as it was at

the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling"); *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir.1982) (in a benefits case, the court "must ascertain whether the Secretary's finding of *improvement* to the point of no disability is supported by substantial evidence"); *Patti·v. Schweiker*, 669 F.2d 582, 586–87 (9th Cir.1982).

2. *Frequency of Review: Medical Diary or CDI*

In addition to the controversy about the choice between the current evidence standard and the medical improvement standard, there was also some question about how frequently benefit recipients would be reviewed to see if they should be terminated. Until March 1981, the SSA followed the "medical diary program," according to which the SSA picked out a few benefit recipients for fairly close observation. Those recipients were chosen because they had great potential for medical recovery. Under this program, relatively few recipients received regular review, and it was therefore a lenient program from the point of view of most recipients.

In 1980, Congress, concerned that too many people who were no longer disabled were still receiving SSDI or SSI benefits, passed 42 U.S.C. § 421(h) which required review at least every three years for all cases. The across-the-board reviews commenced in March 1981 under the continuing disability investigations (CDI) program.

3. *Reviewability of SSA Decisions by Federal Courts*

Congress has specifically provided for judicial review of disability benefit deci-

---

**3.** The operating manual for the state agencies is the Disability Insurance Manual, or DISM; the federal manual is the Programs Operations Manual System, or POMS.

**4.** In its promulgation of its final rules, the SSA misstated for the second time the date on which it had surreptitiously adopted the current evidence standard. The announcement of the final rules stated that it had changed its policy "[a]bout three years ago." 45 Fed.Reg. 55,568

(August 20, 1980). This is consistent with the announcement in the Federal Register the previous year that the SSA had adopted the current evidence standard two years before. The undisputed evidence indicates, however, that the switch had occurred on June 1, 1976, *three* years before the original announcement of the proposed rule changes and *four* years before the announcement of the final changes.

sions by the SSA. 42 U.S.C. § 405(g) (1982) states:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

Section 405(g) thus appears to impose two conditions for jurisdiction: a complainant must have received a final decision from the SSA and must have filed a claim within sixty days of receiving notice of that decision.[5] This court has previously held that the finality condition is analytically separable into two subconditions: presentment of a claim by the complainant to the SSA, and exhaustion of administrative remedies. *See Liberty Alliance of the Blind v. Califano*, 568 F.2d 333, 344 (3d Cir.1977). *See also Kuehner v. Schweiker*, 717 F.2d 813, 817 (3d Cir.1983), *vacated and remanded,* — U.S. —, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984).

### B. *Procedural History of the Present Case Through Passage of the Social Security Disability Benefits Reform Act of 1984*

On April 29, 1982, plaintiffs, a class of Pennsylvania residents whose SSDI and SSI benefits had been terminated, filed a complaint in the Eastern District of Pennsylvania alleging that the terminations had been wrongful because the SSA had used the current evidence standard rather than the medical improvement standard in reviewing their cases. Plaintiffs sought declaratory and injunctive relief preventing SSA from continued use of the current evidence standard. Jurisdiction was predicated on 42 U.S.C. § 405(g). The next day, April 30, 1982, the district court certified a class of

all Pennsylvania [SSDI and SSI] disability beneficiaries whose benefits have been terminated or are threatened with termination who have presented claims for continuing disability.

The certification order did not specify an onset date for the class, *i.e.,* a date by which claimants had to have filed their claims in order to be included in the class.

On July 30, 1982, before discovery had been completed, the district court dismissed the complaint for lack of jurisdiction on the grounds that plaintiffs had not exhausted their administrative remedies. The court ruled that exhaustion was required by 42 U.S.C. § 405(g) which permits judicial review of only *"final* decision[s] of [SSA]." (emphasis supplied) *See Kuehner v. Schweiker*, 547 F.Supp. 49 (E.D.Pa.1982), *rev'd,* 717 F.2d 813 (3d Cir.1983), *vacated and remanded,* — U.S. —, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984).

This court found that § 405(g) did not require the exhaustion of administrative remedies for jurisdiction over a class action lawsuit for injunctive relief, and accordingly reversed. *Kuehner v. Schweiker*, 717 F.2d 813, 817–18 (3d Cir.1983), *vacated and remanded,* — U.S. —, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984). The government petitioned for certiorari.

### C. *The Social Security Disability Benefits Reform Act of 1984*

While the government's petition for certiorari was pending, there were statewide class actions pending in seventeen other states presenting similar challenges to the SSA's disability benefits procedures. Concerned by the potential widespread confusion and injustice of divergent decisions, Congress sought to rectify the situation by passing the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 98–460, 98 Stat. 1794 (1984) (SSDBRA). The SSDBRA instructed the SSA to use the medical improvements standard in review-

---

5. We reiterate that we take no position as to whether the sixty-day requirement is jurisdictional or a statute of limitations, for that is not relevant to our holding. Our reference to the time limit as a "condition[ ] for jurisdiction" is not to be taken literally but to be broadly construed.

ing the propriety of terminating SSDI and SSI benefits for all cases after passage of the Act.[6] Moreover, Section 2(d) of the SSDBRA provided that the medical improvement standard would not only apply *prospectively* from the date of the act's passage, but also *retrospectively* in certain specified instances. Of particular importance for present purposes is the SSDBRA's treatment of unnamed members of class actions certified before September 19, 1984:

> In the case of a [SSDI or SSI] recipient of benefits ...
>> (A) who has been determined not to be entitled to such benefits on the basis of a finding [of no disability], and
>> (B) *who was [an unnamed] member of a class certified on or before September 19, 1984, in a class action relating to medical improvement pending on September 19, 1984....*
> the court shall remand such case to the Secretary. The secretary shall notify such individual by certified mail that he may request a review of the [termination] determination based on [the medical improvement standard]. Such notification shall specify that the individual must request such review within 120 days after the date on which such notification is received. If such review is made in a timely manner, the Secretary shall make a review of the determination.

Pub.L. No. 98–460, § 2(d)(3), 98 Stat. 1794, 1798 (1984) (emphasis supplied). Thus, the cases of unnamed members of classes certified on or before September 19, 1984 were remanded to SSA for reconsideration under the medical improvement standard.[7] Those

who were not members of classes certified by that day, however, were barred by the SSDBRA: "No class in a class action relating to medical improvement may be certified after September 19, 1984, if the class seeks judicial review of a decision terminating entitlement ... prior to September 19, 1984." Pub.L. No. 98–460, § 2(d)(5), 98 Stat. 1794, 1798 (1984).[8]

### D. *Procedural History of the Present Case After the SSDBRA*

The SSDBRA appeared to settle the issue at the heart of the plaintiffs' case. It clearly stated that the plaintiffs, whose class had been certified well before September 19, 1984, were entitled to review of their terminations by SSA according to the medical improvement standard. Consequently, the Supreme Court acted on the pending certiorari petition by vacating and remanding the decision of this court with instructions to

> (1) remand the cases of the named respondents to the Secretary for review pursuant to Section 2(d)(2)(C) of the Social Security Disability Benefits Reform Act of 1984; (2) *make any necessary clarifications in the definition and scope of the class;* (3) remand the cases of the unnamed class members to the Secretary for proceedings pursuant to Section 2(d)(3) of the Act; and (4) take other actions appropriate in light of the Act.

*Kuehner v. Heckler,* —— U.S. ——, ——, 105 S.Ct. 376, 376, 83 L.Ed.2d 312 (1984) (emphasis added).

On remand in the district court, both the plaintiffs and the Secretary requested re-

---

**6.** Section 2(a) of the Act states that:

A recipient of [SSDI or SSI] benefits ... may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by—
  (1) substantial evidence which demonstrates that—
    (A) there has been any medical improvement in the individual's impairment or combination of impairments....

**7.** The Act also stated that the cases of *named* class members and of individual plaintiffs would automatically be reviewed in accordance with the medical improvement standard. § 2(d)(2)(C). Named class members and individual plaintiffs thus had a slightly easier time than unnamed class members, for the former received review automatically whereas the unnamed members had to request review.

**8.** September 19 was chosen as the cut-off date because that was the date on which the House and Senate approved the Conference Report.

mand of the cases of unnamed class members to the SSA pursuant to § 2(d)(3). The parties disagreed, however, on the scope of the class. Plaintiffs argued that the class should include all those who were denied disability benefits since June 1, 1976, because that was the date that the SSA replaced the medical improvement standard with the current disability standard. *See supra* pp. 154–155. The Secretary argued that the class should include only those whose benefits were cut off since February 28, 1982, sixty days prior to the commencement of the action. In support of her position, the Secretary relied on the time limit provision of § 405(g) which provides that a benefits recipient may "obtain a review ... by a civil action *commenced within sixty days*" after receiving notice of the adverse decision (emphasis added).

The district court found for the plaintiffs and clarified its April 30, 1982 certification order to make clear that the certified class included all those whose SSDI and SSI benefits had been terminated, or who had an administrative or judicial appeal pending, on or after June 1, 1976. The Secretary filed the present appeal.

## II. SSDBRA § 2(d)(3) AND § 405(g)'s SIXTY–DAY TIME LIMIT

As noted above, when Congress passed the SSDBRA there were eighteen pending statewide class actions involving issues similar to the issues here. We are aware of two federal court decisions which, under similar circumstances, permitted certification of classes dating back to June 1, 1976. *See Avery v. Heckler,* 762 F.2d 158 (1st Cir.1985); *Schisler v. Heckler,* 107 F.R.D. 609, (W.D.N.Y. 1984), *appeal pending,* No. 85–6092/6097 (2d Cir.). In *Avery,* however, the Secretary apparently did not raise the statute of limitations argument; although the Secretary did raise the argument in *Schisler,* that court's solution is not applicable here for reasons discussed below. We are thus without judicial guidance on the precise question raised by the Secretary's argument.

The Secretary's argument hinges upon the relationship between SSDBRA § 2(d)(3) and § 405(g).[9] The Secretary argues that the certified class cannot include those whose benefits were terminated before February 28, 1982 because such cases are barred by the sixty-day limit period imposed by § 405(g). This is essentially a two-step argument. First, the Secretary argues that the SSDBRA "takes the classes as it finds them"; that is, it does not create new classes of potentially eligible recipients, but rather guarantees the benefits of the medical improvement standard to already certified classes. In support of this position, the Secretary invokes the clear language of § 2(d)(3) which provides protection to any recipient "who was a member of a class certified on or before September 19, 1984 ... but not identified by name as a member of the class...." and the limiting language of § 2(d)(5) quoted above. *See supra* at page 156.

Second, the Secretary argues that on account of the explicit sixty-day limit provision of § 405(g), no one whose benefits were cut off before February 28, 1982 could have been a member of the class certified on April 30, 1982. The Secretary concludes that the benefits of SSDBRA do not flow to such people, and the district court's order is therefore not a clarification of its previous class certification as permitted by the Supreme Court order, but rather the unjustified creation of a larger class.

The Secretary supplements this argument with evidence of legislative intent. Specifically, the Secretary notes the statements of Senator Dole, one of the managers of the bill in the Senate, to the effect that the purpose of § 2(d)(3) was to protect the "reasonable expectations," 130 Cong. Rec. S11,454 (daily ed. Sept. 19, 1984) of those in certified classes that they would receive judicial review of their cases. The Secretary argues that because those for

---

**9.** Because this is a pure question of law, our review is plenary. *Tustin v. Heckler,* 749 F.2d 1055, 1060 (3d Cir.1984).

whom the sixty days had run out by February 28, 1982 could not have had reasonable expectations of further review, remanding such cases to the Secretary is contrary to the legislative intent underlying the SSDBRA.

■ These arguments are not without force, but we feel that they are ultimately unpersuasive. The SSDBRA permits class certification without regard for § 405(g) limitations, and therefore the class certification at issue in this case may extend back to June 1, 1976.

The recent Supreme Court case of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provides the starting point for our analysis. The Supreme Court established the standard for judicial review of an agency's construction of a statute that it administers:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determined Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at ——, 104 S.Ct. at 2781–82 (footnotes omitted). The Court also cautioned that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." 467 U.S. at —— n. 9, 104 S.Ct. at 2782 n. 9 (citations omitted).

Whether Congress has "directly spoken to the precise question at issue," or whether it "had an intention on the precise question at issue," will frequently be difficult to answer in the affirmative. By narrowing the court's scope of review, *Chevron* may mark a retreat from the close judicial scrutiny of agency decisions that had characterized the hard look doctrine prevailing until *Chevron*. *See, e.g., Public Service Commission v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 3037, 77 L.Ed.2d 668 (1983) (scrutinizing agency rulemaking in light of "history, structure and basic philosophy" of its authorizing statute); *Industrial Union Dep't v. American Petroleum Institute*, 448 U.S. 607, 641, 100 S.Ct. 2844, 2863, 65 L.Ed.2d 1010 (1980) (considering the broad purpose of the statute in reviewing the statute in reviewing agency actions); *see also* Garland, *Deregulation and Judicial Review*, 98 Harv.L.Rev. 507, 551–52 (1985) ("it is fair to say that the *Chevron* opinion adopts a tone considerably more deferential to agency decision-making" than had characterized the hard look doctrine); DeLong, *The Bubble Case*, Ad.L.News, Fall 1984 at 5, 7; *The Supreme Court, 1983 Term*, 98 Harv.L.Rev. 87, 250 (1984) (*Chevron* indicates "a retreat from the close scrutiny that judicial review has traditionally entailed.") *But see* Garland, *supra* at 552–53 (concluding that despite its tone, "*Chevron* need not be read as a retreat from the commitment to hard look review"). Nevertheless, we believe that Congress did have an intention on the precise issue of whether § 405(g)'s sixty-day requirement applies to § 2(d)(3) of SSDBRA.[10]

---

**10.** One final preliminary point is worthy of note. The Secretary's argument, based as it is, in part, on statutory language, raises the question of whether it is appropriate to consider legislative history at all when the language of the statute apparently admits of no ambiguity. This court has recently considered this issue and held that even when a statute's language is

The first evidence that Congress intended the sixty-day limitation provision of § 405(g) not to apply to § 2(d)(3) is the fact that the Senate version of the SSDBRA *did* impose the sixty-day requirement. The Senate bill limited its retrospective relief to those former recipients who

> obtained a final decision of the Secretary [and] follow[ed] pursuit of all available steps in the administrative appeal process in conformity with the time limits, exhaustion requirements and other provisions of [42 U.S.C. § 405(g)].

130 Cong.Rec. S6202 (daily ed. May 22, 1984). The House version did not contain such a limitation to § 2(d)(3); it made no mention of § 405(g). Congress was therefore presented with a clear choice of whether the § 405(g) limitations would apply to § 2(d)(3) or not. Congress chose the House version, and the conclusion seems inescapable that Congress' repudiation of the Senate bill implies that it wanted § 405(g) not to interfere with § 2(d)(3).

Statements by Senator Dole at the time of the SSDBRA's passage support this conclusion. In presenting the final version of the bill to the Senate, Senator Dole said

> [T]he conference report [that accompanied the final version of the Act] eliminates portions of the language in the effective date of the Senate bill relating to the time limits, exhaustion requirements, and other provisions of [42 U.S.C. § 405(g)].... The effective date provision does ... permit all class members of certified class actions to seek review of their cases under the medical improvement standard establish[ed] in this act, *even where they may not have pursued their appeal rights in accordance with [42 U.S.C. § 405(g)].*

130 Cong.Rec. S11,454 (daily ed. September 19, 1984) (emphasis supplied). This explicit statement that § 405(g) would not limit the operation of § 2(d)(3) must be given great weight because Senator Dole was one of the bill's Senate managers, *see Mills v. United States*, 713 F.2d 1249, 1253 (7th Cir.1983) (representative's remarks "are entitled to substantial weight since he acted as floor manager of the bill"); *Pan American World Airways, Inc. v. C.A.B.*, 380 F.2d 770, 782 (2d Cir.1967) (standing for same proposition), *aff'd, sub nom. World Airways, Inc. v. Pan Am World Airways, Inc.*, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1967), and because he was the chairperson of the Senate Finance Committee which had reported the bill, *see Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 242–43 (D.C.Cir.1981) (special weight is accorded view of representative who "was a primary supporter of the Sunshine legislation for many years and chaired the House subcommittee that originally considered the bill"); Singer, *Sutherland Stat. Const.* § 48.14 at 334 (4th ed. 1984). *See generally Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 381–82 (D.C.Cir.1973) (statements of most active legislators are entitled special weight).

Finally, when the SSDBRA was in its final form, the Joint Committee that had resolved the differences between the House and Senate versions issued a Joint Explanatory Statement. The Joint Statement is a particularly useful indicator of legislative intent because, more than any other document, it reflects the sentiments of both houses. It is the closest we have to an "official legislative interpretation" of the SSDBRA. *See Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir.1985) ("Because

---

clear, it is appropriate to look to legislative intent to interpret the statute. *Paskel v. Heckler*, 768 F.2d 540, 543 (3d Cir.1985). *See also Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir.1944) ("[t]here is no surer way to misread any document than to read it literally") (L. Hand, J.), *aff'd sub nom. Gemsco v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945); Murphy, *Old Maxims Never Die: The "Plain Meaning" Rule and Statutory Interpretation in the "Modern"*

*Federal Court*, 75 Colum.L.Rev. 1299 (1975) (arguing that the plain meaning rule is unsound and that legislative intent must always be consulted in statutory interpretation). Although we recognize that "clear statutory language places an extraordinarily heavy burden on the party who seeks to vary it by reference to legislative history," *Paskel v. Heckler*, 768 F.2d at 543, we believe that the legislative history, when viewed in its entirety, is persuasive.

the 'conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent' ") (quoting *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir.1981)); *Railway Labor Executives' Ass'n. v. I.C.C.,* 735 F.2d 691, 701 (2d Cir.1984) (same); Singer, *Sutherland Stat. Const.,* § 48.08 at 315 (4th ed. 1984); Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,* 68 Iowa L.Rev. 195, 201 & n. 49 (1983) ("Conference committee reports and statements of floor managers are considered particularly weighty."). The Statement said, in relevant part:

> The conference agreement provides for an opportunity for redetermination under the new standard of all claimants who are members of class actions which have been certified as of September 19, 1984. However, *this is in no way intended to express a view, one way or another, as to whether those classes would otherwise have been found to be properly certified in accordance with the exhaustion and finality requirements of section 205 of the Social Security Act [42 U.S.C. 405(g)].* The conference agreement provides that the existing certified classes will be covered by the new standard in order to resolve the existing controversy over the medical improvement standard.

[1984] U.S.Code Cong. & Ad.News, 3038, 3080, 3085 (emphasis supplied). Once again, it is evident that the scope of § 2(d)(3) was to be determined without regard for the limitations of § 405(g).[11]

The evidence just adduced convinces us that the § 405(g) time limitation does not apply to SSDBRA § 2(d)(3). However, the

plaintiffs and the district court offer yet another reason for finding that the class extended back to June 1, 1976. They point out that the change from the medical improvement standard to the current evidence standard was carried out surreptitiously. *Supra* pp. 154–155. Consequently, they argue, those who were terminated before the SSA announced that it was using the current evidence standard could not have known that they were being wronged. Plaintiffs conclude that the statute of limitations[12] must be tolled for those people, for they were not informed about, and could not discover, the wrong that was done to them.

This argument was relied upon by the court in *Schisler v. Heckler,* 107 F.R.D. 609 (W.D.N.Y.1984), *appeal pending,* No. 85–6092/6097 (2d Cir.). Although it is somewhat persuasive, it does not solve the whole problem before us and therefore we do not rely upon it. It is true that those who had no way of knowing that the SSA was using the incorrect standard of review on their cases could not be expected to complain to the district court. The statute of limitations against such people may indeed have been tolled as soon as they were wronged. *See City of New York v. Heckler,* 742 F.2d 729, 738 (2d Cir.1984), *pet. for reh. den.,* 755 F.2d 31 (1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 57, 88 L.Ed.2d 46 (1985) (relied upon by *Schisler* court). However, the statute of limitations is not tolled for those whose benefits were terminated after August 20, 1980 and before February 28, 1982, because they had constructive notice through the announcement in the Federal Register that SSA intended to use the current evidence standard.[13] As to those plaintiffs, an analysis along the lines already

---

**11.** That the Statement refers only to § 405(g)'s exhaustion and finality requirements and not to that section's statute of limitations does not appear to be relevant. Nowhere else in the legislative history does anyone draw a distinction between § 405(g)'s exhaustion and finality requirements on the one hand, and its time limit provision on the other. Therefore, we believe that the Statement's failure to mention § 405(g)'s time limit provision was simply an oversight rather than a meaningful omission.

**12.** This argument of course assumes that the sixty-day time limit is indeed a statute of limitations and not jurisdictional. We assume this, *arguendo,* for the purpose of analyzing this argument. We remain, however, uncommitted on this point. *See supra* note 1.

**13.** It might be argued that the preliminary announcement of July 3, 1979, *see supra* at p. 155, was constructive notice to all parties that the SSA was using the current evidence standard.

suggested in this opinion, *supra* pp. 159–161, is required. The claim in *Schisler* was filed a month before August 20, 1980, so the *Schisler* court never faced this problem.

## III. THE SECRETARY'S FURTHER ARGUMENTS

The Secretary presents two additional arguments in the alternative. The first raises another question of statutory interpretation of SSDBRA. The final argument concerns the district court's understanding of its own April 30, 1982 certification order. We are not without guidance on these questions, as we were in Part II, *supra*, for the Secretary has presented these or analogous arguments in other courts.

### A. *The SSDBRA and the CDI Program*

■ The Secretary argues that, even if the SSDBRA does override the § 405(g) time limitation, it is still limited to providing benefits to classes of only those people whose benefits were cut off on or after March 1, 1981, the day the CDI program was instituted. In support of this argument, the Secretary refers to the "Purpose and Scope" section of the House Ways and Means Committee's Report which focuses on the SSA termination process "over the last several years," H.R.Rep. No. 618, 98th Cong., 2d Sess. (1984) at 2, *reprinted in* [1984] U.S.Code Cong. & Ad.News 3038, 3039. *See also id.* at 10, [1984] U.S.Code Cong. & Ad.News at 3047 (discussing the impact of the CDI program). The Secretary also emphasizes the Senate Finance Committee's concern that "the review process mandated under the 1980 amendments" had created significant problems that the Act was aimed at redressing. S.Rep. No. 466, 98 Cong. 2d Sess. (1984) at 6. *See also* 130 Cong.Rec. H9828 (daily ed. Sept. 19, 1984) (Conference Agreement referring to the controversy created by "periodic," or CDI, review). The Secretary would have us read these temporal references as terms of limitation that imply that

the SSDBRA was intended to apply only to those whose benefits were terminated as part of the CDI program, rather than as part of the medical diary program.

This argument has no merit. The SSDBRA does not distinguish between "diaried" and CDI review claimants. It applies to any "member of a class certified on or before September 19, 1984, in a class action relating to medical improvement pending on September 19, 1984." Pub.L. No. 98–460, *supra*, § 2(d). It thus appears clear that Congress left the scope of § 2(d) for the courts to determine, and did not distinguish between pre- and post-1981 claimants. *See Avery v. Heckler*, 762 F.2d 158, 163 (1st Cir.1985).

The legislative history supports this reading and does not support the distinction urged upon us by the Secretary. The House Report notes that the problem of unfair terminations pursuant to the current evidence standard was *exacerbated* by the substitution of CDI for the medical diary program, *see* H.R.Rep. No. 618, 98 Cong., 2d Sess. (1984) at 10, [1984] U.S.Code Cong. & Ad.News at 3047, but that simply means that the problem became more acute after 1981; it does not imply that the benefits of the Act were intended to be limited to only CDI claimants. *Cf. Ciampa v. Secretary of Health and Human Services*, 687 F.2d 518, 525 (1st Cir.1982) ("a statute's scope can extend beyond the particular examples used by legislators in debate"). The Senate Report is similarly devoid of evidence of intent to limit the applicability of the SSDBRA to those who had been reviewed under CDI, and to ignore those who were terminated as part of the medical diary program.

Our conclusion accords with the First Circuit decision in *Avery v. Heckler*, 762 F.2d 158 (1st Cir.1985). When the Secretary raised this same argument before the First Circuit, the court dealt with it summarily: "[W]e fail to see the relevance of the Secretary's point; she makes no convincing argument why this distinction

We need not decide that question for we do not rely on this ground in reaching our decision.

makes any relevant difference." *Id.* at 162.

### B. *The Original Intent of the Certification Order*

■ The Secretary's final argument is that the district court intended its original April 30, 1982 certification to extend only to those whose benefits had been cut off as part of the CDI program, *i.e.*, since March 1, 1981, and therefore that its most recent order was an expansion rather than a clarification of the class. The expansion, the Secretary argues, violates § 2(d)(3) and the Supreme Court order that expressly permitted a clarification, not an expansion.

In support of this position, the Secretary argues that the original complaint contained "myriad references" to terminations occasioned by the CDI process, but none dating back before March 1, 1981. The Secretary suggests that the complainants themselves contemplated a March 1, 1981 cut-off date, and that therefore the district court was never presented with any class broader than that.

Once again, this argument is simply not tenable. In the first place, one of the named plaintiff's benefits had been terminated in June, 1980. As this fact was pleaded in the original complaint, the district court was aware of it. Thus, it cannot be said that the district court intended that the class extend back only as far as March, 1981.

Second, the plain language of the original order gives no hint that the district court intended the class to be limited to those whose benefits were terminated on or after March 1, 1981. When the complaint was filed, the court was doubtless unaware of how long the Secretary had been using the improper current evidence standard. The order included *"all ... Pennsylvania disability beneficiaries ...,"* and the logical reading of the order suggests that it was framed to encompass the broadest possible scope with the expectation that the court would later specify what that scope was. Initially framing the class in broad strokes and later filling in the details is a standard practice of courts faced with difficult class actions in which several relevant facts will not become known until discovery is well underway. *See, e.g., Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.1983) ("the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case"), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527 (1983); *Reynolds v. Sheet Metal Workers, Local 102,* 702 F.2d 221, 226 (D.C.Cir.1981). This practice is explicitly provided for by Fed.R. Civ.P. 23(c)(1) which states that a certification order "may be conditional, and may be altered or amended before the decision on the merits." *See also* Wright & Miller, *Federal Practice and Procedure: Civil* § 1785 at 137–38 & Supp. at 169 n. 81; *Manual for Complex Litigation, Second* §§ 30.11–30.14, 30.18. The technique appears to have been within the contemplation of the Supreme Court's order to clarify the classes in this case. *Supra* at p. 12. We could scarcely conceive of another course for a court faced with class actions in complex areas.

We are encouraged that the *Avery* court reached the same decision on virtually identical facts. *Avery, supra.* 762 F.2d at 161–62. The Secretary seeks to distinguish *Avery* by noting that in *Avery* the Court of Appeals relied in part on the fact that Secretary herself apparently believed that the 1976–1981 claimants were in the class, and that she moved on remand to remove them from the class. *Id.* at 162. Here, by contrast, the Secretary argues that she has never understood that the 1976–1981 claimants were in the class and that she is seeking to keep them out, not to remove them.

This is not a valid distinction, for we are concerned with what class the *district court* intended to certify, not with the Secretary's understanding. The evidence adduced above demonstrates that the district court intended its certification to extend as wide as possible. The language of the certification order "refers, not to date, but

to cause of termination." *Id.* There is no justification for limiting it by date.

## IV. CONCLUSION

We hold that the district court's order that the plaintiff class extended back to June 1, 1976 was neither contrary to the SSDBRA nor an unlawful expansion of its original class certification. Accordingly, we will affirm that court's order in all respects. The cases of the members of the plaintiff class will be remanded to the district court to remand to the SSA for proceedings in accordance with § 2(d)(3) of the SSDBRA.