John Vincent WEBER, James M. Ramstad, David F. Durenberger, Plaintiffs,

v.

William M. HEANEY, Bruce D. Willis, Vanne O. Hayes, Elsa M. Carpenter, Douglas R. Ewald, Emily Ann Staples, in their capacities as members of the Minnesota Ethical Practices Board; Minnesota Ethical Practices Board; Michael A. McGrath, in his capacity as Minnesota State Treasurer; Dorothy A. McClung, in her capacity as Minnesota Commissioner of Revenue, Defendants.

Civ. 4–91–1009.

United States District Court, D. Minnesota, Fourth Division.

June 10, 1992.

Douglas A. Kelley, Julie L. Levi, Kelley Law Office, Minneapolis, Minn., for plaintiffs.

Hubert H. Humphrey, III, Minnesota Atty. Gen., and John R. Tunheim, Chief Deputy Atty. Gen., Jocelyn F. Olson, Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, Chief Judge.

This matter is before the Court on plaintiffs' motion for summary judgment. The motion will be granted.

FACTS

This is an action challenging the constitutionality of the Minnesota Congressional Campaign Reform Act (Campaign Reform

Act), Minn.Stat. §§ 10A.40–.51. Plaintiffs are current members of the United States Congress. Compl. ¶ 9–11; Aff. of James M. Ramstad ¶ 1; Aff. of John V. Weber ¶ 1. James M. Ramstad is the United States Representative for the Third District of Minnesota. John Vincent Weber is the United States Representative for the Second District of Minnesota. David F. Durenberger is a United States Senator for the State of Minnesota. Each defendant, who is sued in his or her official capacity, is responsible for enforcing various provisions of the Campaign Reform Act. Defendants William M. Heaney, Bruce D. Willis, Vanne O. Hayes, Elsa M. Carpenter, and Emily Ann Staples are members of the Minnesota Ethical Practices Board (the Board). Compl. ¶ 12. Defendant Douglas R. Ewald is a former member of the Board, who has since been replaced by Douglas H. Silers. Defendant Michael A. McGrath is the Treasurer of the State of Minnesota. Defendant Dorothy A. McClung is the Minnesota Commissioner of Revenue.

Faced with what it perceived as public perception of corruption in federal congressional elections, the Minnesota Legislature enacted the Campaign Reform Act in 1990. *See* 1990 Minn.Laws, c. 608, art. 4 (codified at Minn.Stat. §§ 10A.40–.51). Specifically, the legislature made the following findings:

1) the spending on campaigns for congressional office has increased to a disgraceful level and continues to rise;

2) the need to raise campaign contributions has caused Minnesota congressional candidates to aggressively solicit contributions from special interest groups and out-of-state sources, which diverts them from meeting Minnesota voters and publicly debating the pressing issues of the day;

3) the current practice of congressional campaign contributions and spending, along with current scandals in Washington, D.C., have created a public perception of political corruption and undue influence by wealthy special interests;

4) the United States Congress has debated necessary reforms for years but has failed to act, and the Federal Election Campaign Act does not provide a

means to encourage congressional candidates to voluntarily limit the amount of money they spend in campaigns; and

5) as a consequence, Minnesota's representation in Congress is jeopardized and the public's confidence in its elected congressional representatives is weakened.

Minn.Stat. § 10A.40, subd. 1.

To combat these problems, the legislature enacted a statutory scheme designed to encourage congressional candidates to voluntarily limit the amount of money they spend on campaigns. *See* Minn.Stat. § 10A.40, subd. 2(a). In particular, the Campaign Reform Act was intended to address these perceived problems 1) by establishing voluntary limitations on campaign spending; 2) by providing an alternative source of campaign financing, namely, public funding; 3) by affording candidates the opportunity to focus on public issues rather than fund-raising; and 4) by reducing the influence of special interest groups and out-of-state interests. *See* Minn.Stat. § 10A.40, subd. 2(b)(1), (2), (3), (4). Although the legislature intended to supplement federal law, it did not "intend to enact legislation that is in conflict with existing federal law," nor did it intend "to regulate where specific federal laws have already been enacted." Minn.Stat. § 10A.40, subd. 3.

To effectuate its purposes, the Campaign Reform Act establishes a system that allows for public funding of eligible congressional candidates who have signed agreements to limit campaign expenditures. As part of this public funding system, the Campaign Reform Act first sets up several eligibility requirements. Minn.Stat. § 10A.43, subd. 1(a), (b). Once a congressional candidate has met these eligibility requirements, he or she may choose to sign an agreement limiting campaign expenditures. Minn.Stat. § 10A.43, subd. 2. For an election year, the expenditure limits, which are adjusted for inflation, are $3,400,000 for Senate candidates and $425,000 for House candidates. Minn.Stat. § 10A.44, subd. 1. For a post-election year, the spending limits are twenty per-

cent of the election year figures, or $680,-000 for Senate candidates and $85,000 for House candidates, again adjusted for inflation. Minn.Stat. § 10A.44, subd. 4 & subd. 2.

Candidates who fulfill these eligibility requirements may receive public funding from general state funds of up to twenty-five percent of the expenditure limit, provided that they provide evidence to the Board of contributions equal to the amount of funding sought. Minn.Stat. §§ 10A.43, subd. 1(a), (b) & 10A.48. However, both public funding and these expenditure limitations are conditional. If all the congressional candidates for an office agree to be bound by the limits, no candidate for that office will receive public funding, but all such candidates will be bound by the limits. Minn.Stat. § 10A.44, subd. 5(b). If all major political party candidates for an office agree to be bound by the limits, the major party candidates will not receive public funding, but once again all such candidates will be bound by the limits. Minn.Stat. § 10A.44, subd. 5(c). However, if any congressional candidate agrees to be bound by the limits, but has a major party opponent who declines to be bound by the limits, the candidate who agrees to be bound will receive public funding and will not be bound by the limits. Minn.Stat. § 10A.44, subd. 5(d). Thus, the expenditure limitations and public financing are interrelated.

The Campaign Reform Act also imposes stringent penalties on those who breach agreements to limit campaign spending. Candidates who permit their authorized committees to make aggregate expenditures on their behalf in excess of the expenditure limits are subject to civil fines of up to four times the amount by which the expenditures exceed the limit. Minn.Stat. § 10A.47, subd. 1. The Board is authorized to enforce these spending limits. *See* Minn.Stat. § 10A.47, subds. 3 & 4.

In addition to regulating congressional candidates themselves, the Campaign Reform Act in certain instances affects contributors to congressional campaigns. In particular, contributors to the campaigns of candidates who agree to abide by the spending limits are entitled to a state refund for their contribution. Minn.Stat. § 10A.43, subd. 5. If a candidate files a signed expenditure limitations agreement, he will receive a supply of official refund receipt forms from the Board to be given to contributors. *Id.* Contributors can then in turn file the receipt form and receive a direct state refund of up to $100 per couple or $50 per individual. *See* Minn.Stat. § 290.06, subd. 23.

In two areas the Campaign Reform Act tracks federal law. First, it expressly provides that Minnesota congressional candidates are bound by the federal limits on contributions and loans. *See* Minn.Stat. §§ 10A.45 & .47, subd. 2. Second, the Campaign Reform Act expressly states that the expenditures of political parties on behalf of congressional candidates, as well as all disclosure and reporting requirements, are also governed by federal law. *See* Minn.Stat. §§ 10A.46 & .51. As noted above, the legislature intended the Act to supplement, not contradict, existing federal law.

To date, seven candidates for congressional office have signed and filed expenditure limitation agreements with the Board. Aff. of Mary Ann McCoy ¶ 2.[1] These candidates have also requested and received official contribution receipt forms to distribute to contributors. *Id.* ¶ 3.

Plaintiffs filed their complaint on December 18, 1991, seeking a declaration that the Campaign Reform Act: 1) is preempted by the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431 *et seq.;* 2) violates the First Amendment to the United States Constitution; and 3) violates the Privileges or Immunities Clause of the Fourteenth Amendment. This matter is now before the Court on plaintiff's motion for sum-

---

1. The following individuals have signed and filed agreements with the Board: Phillip C. Herwig (IR, 8th Cong.Dist.); Ian Maitlan (IR, 4th Cong.Dist.); Timothy Penny (DFL, 1st Cong. Dist.); Collin Peterson (DFL, 7th Cong.Dist.); Jim Stone (DFL, 2d Cong.Dist.); Bruce Vento (DFL, 4th Cong.Dist.); and Paul Wellstone (DFL, U.S. Senate).

mary judgment.[2]

DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of the court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

I. *Whether the Campaign Reform Act Is Preempted by the Federal Election Campaign Act*

■ Plaintiffs first challenge the Campaign Reform Act on the grounds of pre-

emption. Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. *Wisconsin Public Intervenor v. Mortier,* —— U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). Because the question of preemption turns on congressional intent, *Mortier,* 111 S.Ct. at 2481, its resolution turns on the interpretation of the federal statute at issue.

Although the lines between them are often blurred, there are generally three broad categories of federal preemption. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–03, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). The first type, express preemption, occurs where Congress has in express terms declared its intent to preclude state regulation in a given area. *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); Tribe, *American Constitutional Law* § 6–26, at 481 n. 14 (2d ed. 1988); 2 Singer, *Sutherland Statutory Construction* § 36.08.50, at 7 (Supp.1992). The most obvious form of express preemption is where Congress enacts a preemption clause on point, explicitly declaring its preeminence in a given regulatory area.

■ The second type, implied preemption, occurs where Congress, through the structure or objectives of federal law, has impliedly precluded state regulation in an area. *Ethridge v. Harbor House Restaurant,* 861 F.2d 1389, 1396 (9th Cir.1988); Tribe, *supra* § 6–26, at 481 n. 14; 2 Singer, *supra* § 36.08.50, at 7 (Supp.1992). Absent explicit preemptive language, Congress' intent to supersede state law altogether may be inferred from a pervasive scheme of federal regulations that is designed to effectuate a strong federal interest. *See Pacific Gas,* 461 U.S. at 203–04, 103 S.Ct. at

---

**2.** Public Citizen, Inc., a nonprofit consumer advocacy organization, filed an amicus curiae brief in support of defendants. Public Citizen,

Inc. shall be referred to throughout this memorandum as "amicus."

1721–22 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)). Such a scheme permits the inference that Congress left no room for supplementary state regulation. *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Put another way, preemption is implied where a federal statutory scheme reflects Congress' intent to "occupy the field." *See Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *United Auto., Aircraft & Agric. Implement Workers of Am. v. Wisconsin Employment Relations Bd.*, 351 U.S. 266, 271, 76 S.Ct. 794, 797–98, 100 L.Ed. 1162 (1956). The crux of both express and implied preemption is whether Congress intended to preclude state regulation in a given area. *See Mortier*, 111 S.Ct. at 2481.

█ The third type of preemption, conflict preemption, occurs where Congress has not entirely displaced state regulation in a specific area, but where a state law actually conflicts with federal objectives and goals. *International Paper Co. v. Ouellette*, 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987). This can arise when compliance with both federal and state regulations is impossible, *see Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, *see Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S.Ct. 399, 404–05, 85 L.Ed. 581 (1941). In evaluating claims of conflict preemption, courts must consider the relationship between state and federal laws not merely as

they are written, but also as they are interpreted and applied. *Rath Packing*, 430 U.S. at 526, 97 S.Ct. at 1310.

█ A party claiming that federal law preempts state law bears a heavy burden. First, there is a general presumption that Congress did not intend to displace state law. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). Second, there is a specific presumption against a finding of federal preemption in areas traditionally regulated by the states. *California v. ARC Am. Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Because this case involves the regulation of congressional elections, for which the Constitution itself prescribes a particular role for the states,[3] *see* U.S. Const. Art. I, § 4, plaintiff's burden is onerous. *See Mortier*, 111 S.Ct. at 2482; *Roudebush v. Hartke*, 405 U.S. 15, 24–25, 92 S.Ct. 804, 810–11, 31 L.Ed.2d 1 (1972).

In this case, the particular federal statute at issue is FECA, which plaintiffs claim preempts the Campaign Reform Act. Resolution of this preemption question thus turns on the Court's construction of the federal statute. *See* Tribe, *supra* § 6–26, at 482–83 n. 8. Given the complexities of federal campaign regulation, a discussion of its history is helpful in analyzing this preemption question.

## A. History of Federal Election Law

The primary source of congressional authority to regulate federal elections is found in Article I, section 4 of the Constitution, which provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each

---

**3.** As amicus correctly notes, the Supreme Court has recognized numerous state interests in regulating federal elections. These interests include: regulating ballot access, *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); regulating voter and candidate qualifications, *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); establishing residency requirements, *Sayler Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); and safeguarding the ability of minority parties to participate in the electoral process, *Norman v. Reed*, —— U.S. ——, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of chusing Senators.

U.S. Const. Art. I, § 4. Pursuant to this authority, Congress has over the years enacted a series of federal statutes regulating federal campaigns.

The modern era of federal campaign regulation began in 1907, when President Roosevelt urged the adoption of a system of public campaign financing. *Buckley v. Valeo*, 519 F.2d 821, 904 (D.C.Cir.1975) (en banc) (per curiam), *aff'd in part and rev'd in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Although Congress did not adopt this proposal, it did enact the Tillman Act of 1907, 34 Stat. 864 (1907). This statute prohibited all federally chartered corporations and national banks from making money contributions in connection with elections. "As the historical background of this statute indicates, its aim was not merely to prevent the subversion of the integrity of the electoral process. Its underlying philosophy was to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." *United States v. United Auto Workers*, 352 U.S. 567, 575, 77 S.Ct. 529, 533, 1 L.Ed.2d 563 (1957).[4]

In 1910, Congress enacted the first federal disclosure law, Act of June 25, 1910, ch. 392, §§ 5–6, 36 Stat. 823 (1910). This statute required political committees, defined as national committees, national congressional campaign committees of parties, and organizations operating in congressional elections within two or more states, to disclose all transactions involving more than $100. Identification of recipients of expenditures of $10 or more was also required. *Id.* §§ 1, 5–6, 36 Stat. 822–24. In addition, annual expenditures of greater than $50 for the purpose of influencing the result of a congressional election had to be reported. *Id.* § 7, 36 Stat. 824. Congress

amended this statute in 1911 to include, for the first time, overall expenditure ceilings on campaigns for the House ($5,000) and for the Senate ($12,000), as well as detailed reporting requirements. *See* Act of Aug. 19, 1911, ch. 33, § 2, 37 Stat. 26–29 (1911). This amendment also broadened the disclosure requirements to include primary, convention, and other pre-nomination periods. *Id.* In 1918, Congress added criminal penalties for offering money to influence voting. Act of Oct. 16, 1918, ch. 187, 40 Stat. 1013.

In 1921, one Truman Newberry was convicted of violating the Tillman Act's expenditure ceiling in his 1918 Michigan primary race. The Supreme Court reversed his conviction and declared the portions of the amendment regulating the expenditures of those running in political primaries unconstitutional, on the grounds that Congress lacked the constitutional authority to regulate the internal affairs of political parties. *See Newberry v. United States*, 256 U.S. 232, 258, 41 S.Ct. 469, 474–75, 65 L.Ed. 913 (1921).

After *Newberry*, Congress tightened the surviving portions of the Tillman Act by enacting the Federal Corrupt Practices Act of 1925, 43 Stat. 1070 (1925) (codified at 18 U.S.C. §§ 610–17). This statute broadened the disclosure requirements and extended the proscription on contributions by federally chartered banks and corporations to all contributions of every form. Soon thereafter, the Supreme Court upheld the Federal Corrupt Practices Act in *Burroughs v. United States*, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934). Reasoning that Congress could properly find that disclosure requirements would tend to prevent the corrupting influence of money in elections, the Court determined that the statute as a whole was tightly drafted to effectuate this purpose. *Id.* at 547–48, 54 S.Ct. at 290–91. Until its repeal in 1971, the Federal Corrupt Practices Act remained the primary campaign finance law. *See* Federal Elec-

---

**4.** This Act has faced strong challenge in recent years. *See Federal Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238, 107 S.Ct. 616, 626–27, 93 L.Ed.2d 539 (1986). To date, the Supreme Court has declined to determine the constitutionality of federal restrictions on corporate and union political activity. *See* Bolton, *Constitutional Limitations on Restricting Corporate & Union Political Speech*, 22 Ariz.L.Rev. 373, 373 (1980).

tion Campaign Act of 1971, Pub.L. No. 92–225, § 405, 86 Stat. 20 (1971).

In 1939, Congress enacted the Hatch Political Activity Act (Hatch Act), ch. 410, 53 Stat. 1147 (1939) (codified at scattered sections of 5 & 18 U.S.C.), which banned overt political activities by all federal employees except presidential appointees. The Supreme Court upheld these restrictions in *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and later in *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In 1940, Congress also limited the total expenditures of political committees to $3 million and limited gifts to either candidates or political committees to $5,000 in any calendar year. Act of July 19, 1940, ch. 640, 54 Stat. 767; *see Buckley*, 519 F.2d at 905.

In 1943, Congress extended the Federal Corrupt Practices Act's prohibition on contributions to labor unions in the War Labor Disputes Act (Smith–Connally Act), ch. 144, § 9, 57 Stat. 167 (1943). But this statute expired by its terms in 1945, so Congress, as part of the Labor Management Relations Act (Taft–Hartley Act), ch. 120, § 304, 61 Stat. 159 (1947), enacted another provision including labor unions within the ban on contributions. The Taft–Hartley Act also prohibited corporations and unions from making campaign expenditures on behalf of candidates, thus eliminating a loophole that permitted both groups to accomplish through expenditures what they could not do through contributions. Because the Supreme Court impliedly overruled *Newberry* 's proscription on congressional regulation of primaries in *United States v. Classic*, 313 U.S. 299, 317, 61 S.Ct. 1031, 1038–39, 85 L.Ed. 1368 (1941), Congress through the Taft–Hartley Act also extend-

ed its regulation of federal elections to include primaries.

Thus, the Tillman Act, the Federal Corrupt Practices Act, the Smith–Connally Act, the Hatch Act, and the Taft–Hartley Act reflect Congress' historical efforts to develop stringent regulation of federal campaigns.[5] Nahra, *Political Parties & the Campaign Finance Laws: Dilemmas, Concerns & Opportunities*, 56 Fordham L.Review 53, 58 (1987). However, as at least one commentator has observed, these efforts did not prove effective until the enactment of FECA. *See id.*

**B. Federal Election Campaign Act, 2 U.S.C. §§ 431 et seq.**

After extensive debate, *see* Berry & Goldman, *Congress & Public Policy: A Study of the Federal Election Campaign Act of 1971*, 10 Harv.J. on Legis. 331, 337–56 (1973), Congress passed the Federal Election Campaign Act of 1971, which replaced the Federal Corrupt Practices Act as the governing body of federal law regulating the campaign process.[6] *See* Pub.L. No. 92–225, 86 Stat. 3 (1972) (codified as amended in sections of 2, 18 & 47 U.S.C.). In response to Watergate, and the ensuing public demand for further campaign reform, Congress amended FECA in 1974. *See* 88 Stat. 1263. As amended, FECA sought to reform federal election campaigns in four major respects.

First, Congress enacted a series of limitations on campaign contributions. FECA limits political contributions to any single federal candidate or his authorized committees by an individual or a group to $1,000, *see* 2 U.S.C. § 441a(a)(1)A), and by a political committee to $5,000, *see* 2 U.S.C. § 441a(a)(1)(C), with an overall annual limitation of $25,000 by an individual contributor, *see* 2 U.S.C. § 441a(a)(3). Congress also limited campaign expenditures.[7]

---

**5.** Because of this extensive web of federal regulation, two commentators have referred to election politics as a "regulated industry." Eskridge & Frickey, *Cases and Materials on Legislation: Statutes & the Creation of Public Policy* 210 (1988).

**6.** In addition, Congress created a system of public financing for presidential campaigns by

amending Subtitle H of the Internal Revenue Code and delegated broad enforcement authority to the Federal Election Commission. These portions of FECA, however, are not at issue in this case.

**7.** Soon after Congress enacted the 1974 amendments, FECA was subjected to a vigorous constitutional challenge. In the landmark case of

Second, Congress enacted a series of reporting and disclosure requirements for political contributions that replaced all prior disclosure laws. FECA requires political committees to keep detailed records of contributions and expenditures, *see* 2 U.S.C. § 432(b)(2)(A) & (B), as well as to file quarterly reports with the Federal Election Commission. *See* 2 U.S.C. § 434(a). These quarterly reports are to contain detailed financial information, including the full name, mailing address, occupation, and principal place of business of each person who has contributed over $200 in a calendar year, as well as the amount and date of the contributions. *See* 2 U.S.C. § 434(b). Finally, FECA also requires every individual or group, other than a candidate or political committee, making contributions or expenditures exceeding $250 other than by contribution to a political committee or candidate to file a statement with the Federal Election Commission. *See* 2 U.S.C. § 434(c).

Third, to enforce FECA, Congress created the eight-member Federal Election Commission, *see* 2 U.S.C. § 437c, vesting it with "primary and substantial responsibility for administering and enforcing the Act." *Buckley*, 424 U.S. at 109, 96 S.Ct. at 677–78. As part of its administrative responsibilities, the commission serves as a "national clearinghouse for ... information with respect to the administration of Federal elections." 2 U.S.C. § 438(a)(10). The commission must not only store the volumes of reports and statements that are required to be filed by those engaging in regulated political activities, but must also file and index them as well as make them available for public inspection. 2 U.S.C. § 438(a). Further, the commission is authorized to conduct audits and field investigations of any regulated political committee. 2 U.S.C. § 438(b).

Beyond these administrative and investigatory functions, the commission has been delegated "extensive rulemaking and adjudicative powers." *Buckley*, 424 U.S. at 110, 96 S.Ct. at 678. Congress expressly authorized the commission to "prescribe rules, regulations, and forms to carry out the provisions of [FECA]...." 2 U.S.C. § 438(a)(10) (1970 ed. Supp. IV) (codified now at 2 U.S.C. § 438(a)(8)); 2 U.S.C. § 437d(8). In addition to formal rulemaking, the commission was given the power to render advisory opinions upon request. *See* 2 U.S.C. §§ 437d(a)(7) & 437f. Any person involved in a specific transaction who requests an advisory opinion regarding that transaction and receives a favorable ruling may in good faith rely upon the advisory opinion and cannot be sanctioned under FECA.

### C. Whether FECA Either Expressly or Impliedly Preempts the Campaign Reform Act

The first question in this case is whether FECA either expressly or impliedly preempts the Campaign Reform Act. The cardinal rule of statutory interpretation is that Congress' intent is to be divined in the first instance from the language of the statute itself. *See Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985)). Where the terms of a statute are unambiguous, "judicial inquiry is complete except in rare and exceptional circumstances." *Demarest v. Manspeaker*, 498 U.S. 184, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); *Burlington N. R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987).

#### 1. *Statutory Language*

FECA contains an explicit preemption provision, which provides:

> The provisions of [FECA], and of rules prescribed under [FECA], supersede and preempt any provision of State law with respect to election to Federal office.

2 U.S.C. § 453.

Plaintiffs argue that this language is clear on its face, preempting all state laws

---

*Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court upheld most of the provisions of FECA, but struck down, among other things, certain of its limita-

tions on First Amendment grounds. Congress later repealed these unconstitutional provisions. These provisions, however, are not at issue in this case.

regarding federal campaign financing. By its terms the statute preempts any provision of state law "with respect to election to federal office." Pls.' Mem. at 9 (quoting 2 U.S.C. § 453). Before it was amended in 1974, the preemption clause, according to plaintiffs, sought to preempt only state statutes that directly conflicted with federal law. *See* Federal Election Campaign Act of 1971, section 403, Pub.L. No. 92–225, 86 Stat. 20 (1972). However, plaintiffs claim that the 1974 amendments broadened the scope of the preemption provision, extending it to any state-law provision regarding election to federal office. *See* Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, section 301, 88 Stat. 1289 (1974). This change in statutory language, plaintiffs contend, reflects an intentional expansion of the scope of the preemption provision.

Defendants and amicus respond that the language of section 453 is not nearly as broad as plaintiffs suggest. First, amicus argues that courts have generally rejected the proposition that phrases like "with respect to," as found in section 453, necessarily indicate an intent to preempt broadly. For example, in *Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274 (1st Cir. 1990), the United States Court of Appeals for the First Circuit held that federal asbestos abatement regulations promulgated pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. § 667, which contains a similar "with respect to" provision, did not preempt state regulations establishing a system for training, licensure, and certification of asbestos workers. *See id.* at 280–282. In this case, a literal reading of section 453 would render states powerless, for example, to determine when polls are open and to enforce voter-fraud laws. Because Article I, § 4 of the United States Constitution vests at least some authority in the states to regulate these matters, *see* U.S. Const. Art. I, § 4, defendants argue that plaintiffs' proposed construction is unconstitutionally broad. Moreover, two circuit courts that have addressed the scope of section 453 have found that the language of section 453 is sufficiently am-

biguous so as to necessitate consider other aids in statutory interpretation.

In *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543 (8th Cir.1984), the United States Court of Appeals for the Eighth Circuit rejected a FECA preemption challenge to a Missouri statute that barred Kansas City police officers from making contributions to political campaigns. In reviewing the statute, the court noted that while a law prohibiting certain people from contributing to campaigns for federal office could surely be considered a "law with respect to election to Federal office," section 453 could equally be read to refer primarily to the behavior of candidates, and thus supersede state laws on permissible contributions only to the extent that federal law expressly forbids certain kinds of contributions. *Id.* at 545. The court also observed that some state laws that are certainly valid—particularly those regulating voter registration, voting fraud, and theft of ballots—could be characterized as falling within the scope of section 453, if it were read too broadly. Recognizing these alternative interpretations, the court concluded that "[t]he preemption [provision] ... is not so clear (if any statute ever is) as to preclude us from consulting the legislative history." *Id.*

More recently, in *Stern v. General Elec. Co.*, 924 F.2d 472 (2d Cir.1991), the United States Court of Appeals for the Second Circuit rejected a FECA preemption challenge to state common law governing claims of breach of fiduciary duty of corporate directors and officers and recovery for corporate waste. The plaintiff in that case brought a shareholders' derivative action against the corporation's directors, alleging that they had breached their duties by expending corporate sums in support of a particular political action committee. The district court dismissed the complaint on the grounds that FECA preempted plaintiff's claims for corporate waste. The court of appeals rejected the district court's broad interpretation of section 453. *Id.* at 475. Construing section 453 narrowly, the court, citing *Reeder*, concluded that Congress did not intend to preempt state regulation with respect to non-election related

activities. *Id.* at 475 & n. 3. Although the *Stern* court did not expressly find that the language of section 453 was ambiguous and justified resorting to the legislative history, it expressly relied upon *Reeder* to support its narrow construction of the statute. *Id.*

■ The Court finds that the language of section 453 supports multiple constructions and is thus ambiguous. While at first blush the language seems exceedingly broad, such a construction, as the *Reeder* court found, ignores other equally viable possibilities. More importantly, although the Eighth Circuit's *Reeder* decision does not dispose of the preemption question because the state statute at issue in this case is different, *Reeder* is controlling authority that section 453 is sufficiently ambiguous so as to justify resort to the legislative history. Therefore, the Court will consider extrinsic aids of interpretation. *See Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir.1987).

### 2. *Legislative History*

■ Extrinsic aids of interpretation consist of background information about circumstances that led to the enactment of a statute, events surrounding enactment, and developments pertinent to subsequent operation. 2A Singer, *supra* § 48.01, at 301. Courts generally look first to the legislative history. *Id.* § 48.01, at 302.

#### a. *Committee Reports*

■ The first type of legislative history relied upon in this case is committee reports. As a general rule, committee reports represent the most persuasive indicia of congressional intent. *Housing Auth. of Omaha v. United States Hous. Auth.*, 468 F.2d 1, 6–7 n. 7 (8th Cir.1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); *Mills v. United States*, 713 F.2d 1249, 1252 (7th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). One type of committee report is considered singularly authoritative. Next to the language of the statute itself, conference reports, representing the final statement of terms agreed to by both houses of Congress, are the most persuasive evidence of congressional intent. *Davis v. Luckard*, 788 F.2d 973, 981 (4th Cir.1986).

In support of their positions, the parties rely on three particular committee reports. The first is that of the House Committee that drafted the preemption provision as it currently reads. This report followed a spirited debate on the House floor resulting in the defeat of a proposed amendment that would have permitted states to set lower expenditure limits than those set forth in FECA; *see* 120 Cong.Rec. 27460–65 (1974):

It is the intent of the committee to make certain that Federal law is construed to occupy the field with respect to elections to federal office and that the Federal law will be the sole authority under which such elections will be regulated. Under the 1971 Act provision was made for filing federal reports with state officials and supervisory officers were required to cooperate with, and to encourage, state officials to accept federal reports in satisfaction of state reporting requirements. The provision requiring filing of federal reports with state officials is retained, but the provision relating to encouraging state officials to accept federal reports to satisfy state reporting requirements is deleted. Under this legislation, federal reporting requirements will be the only reporting requirements and copies of the federal reports must be filed with appropriate state officials. The Committee also feels that there can be no question with respect to preemption of local laws since the Committee has provided that the Federal laws supersede and preempt any law enacted by a State, the Federal law will also supersede and preempt any law enacted by a political subdivision of the State.

Defs.' Mem. at 14–15 (quoting H.R.Rep. No. 1239, 93d Cong., 2d Sess. 10–11 (1974), *reprinted in Legislative History of the Federal Election Campaign Act Amendments of 1974* 644–45 (1977)).

According to plaintiffs, this House Committee report reflects that Congress, by

broadening the originally enacted preemption provision, intended to occupy the field with regard to federal elections. In response, the defendants suggest that while the explanation of the preemption provision begins with very broad language, the report narrows to a discussion of state reporting requirements. This, according to the defendants, demonstrates that the House thought section 453 would apply solely to state reporting requirements.

The Court finds that this House committee report is unclear. On the one hand, the phrase "occupy the field" is a preemption term of art. Since at least 1956, the Supreme Court has on occasion used this phrase in holding that Congress intended to preclude any state regulation in a particular area. *See United Auto., Aircraft & Agric. Implement Workers v. Wisconsin Employment Relations Bd.,* 351 U.S. 266, 271, 76 S.Ct. 794, 797–98, 100 L.Ed. 1162 (1956). Consequently, one could infer that the House, by using this term of art in its report, intended that section 453 would be construed just as broadly. Persuasive as this argument may be, however, it is undermined by the fact that the phrase "occupy the field" is modified by "with respect to federal elections." The parties in this case do not dispute that section 453 preempts at least some state laws. Rather, the issue is whether the Campaign Reform Act in particular falls within the scope of the phrase "with respect to federal elections." By defining the scope of preemption in the exact same ambiguous terms as those used in the statute, the language of this House report offers little guidance.

The second report submitted to the Court is that of the conference committee. The conference committee also expounded on the effect of the preemption provision:

> The conference substitute follows the House amendment. It is clear that the Federal law occupies the field with respect to reporting and disclosure of political contributions to and expenditures by federal candidates and political committees, but does not affect State laws as to the manner of qualifying as a candidate or the dates and places of elections.

Defs.' Mem. at 14 (quoting Conf.Rep. No. 1237, 93d Cong.2d Sess. (1974), *reprinted in* 1974 United States Code Cong. & Admin.News 5587, 5668). Plaintiffs argue that a logical reading of this report suggests that the conference committee was expressly listing those areas of state law that were not preempted, while preserving the sweeping preemptive effect of the newly adopted clause. In response, defendants contend that this report reveals that the broad language of section 453 was intended to preempt state law concerning only reporting and disclosure of contributions to and expenditures by candidates and their committees. In contrast, the Campaign Reform Act leaves all reporting requirements to FECA while providing an option for candidates to agree to spending limits.

Once again the Court finds that this conference report does not dispose of the issue. In this report, the conference committee accepted the House amendment, which indicates that it also accepted the House's meaning of the provision. This would suggest that the provision should be given the broad interpretation advanced by the House. Instead of adopting the House explanation for the amendment, however, the conference committee expressly distinguished between federal laws governing reporting and disclosure requirements and state laws governing candidate qualifications and the manner of conducting elections. As amicus notes, had the conference committee wished to adopt the House's analysis, it could have done so explicitly. Mem. of Amicus Curiae at 14 n. 3 (citing Conf.Rep. No. 1237, 93d Cong., 2d Sess. (1974) *reprinted in* 1974 U.S.Code Cong. & Admin.News at 5637 (expressly adopting the House statement regarding the amendments to 18 U.S.C. § 611). This distinction restricts the preemptive scope somewhat. Although the language does distinguish between expenditures by federal candidates and non-preempted state-law matters, the only conclusion that the Court draws from this report is that the conference committee's intent as to whether states could impose expenditure limits was ambiguous.

The final report submitted to the Court pertains to the criminal preemption provisions of the 1974 amendments to FECA:

The provisions of the conference substitute make it clear that the Federal law occupies the field with respect to criminal sanctions relating to limitations on campaign expenditures, the sources of campaign funds used in Federal races, the conduct of Federal campaigns, and similar offenses, but does not affect the State's rights to prohibit false registration, voting fraud, theft of ballots, and similar offenses under State law.

Pls.' Mem. at 11 (quoting Conf.Rep. No. 1237, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 5638). Plaintiff contends that this report reflects Congress' intent to preempt state laws relating to limitations on campaign expenditures. In response, defendants contend that this report is of no weight because it involves a different provision that was subsequently repealed. Amicus, contrasting this report to that discussing section 453, suggests that had Congress intended to occupy the field relating to limitations on campaign expenditures, it could have done so with the same clarity that it used in the legislative history of the criminal preemption provision.

The Court finds that this final report is of little interpretive value. First, as defendants note, the language pertains to the criminal preemption provisions of FECA, not section 453, the civil preemption provision. More importantly, however, Congress later repealed the criminal preemption provision in response to *Buckley.* The Court declines to rely upon the legislative history of a repealed provision to interpret a different provision that was not repealed.

### b. Legislative Debates

■ The next pieces of legislative history relied upon by the parties are selected quotations from the legislative debates surrounding the enactment of the 1974 amendments. Originally, statements by individual members of the legislature made during the general debate on a bill were considered useless in construing statutes. *See*

*Aldridge v. Williams,* 44 U.S. (3 How.) 9, 24, 11 L.Ed. 469 (1845). Modern courts have loosened this prohibition. Now, as a general rule, statements of individual legislators are considered at least probative of legislative intent so long as they are consistent with the statutory language and the rest of the legislative history. *See Grove City College v. Bell,* 465 U.S. 555, 566–67, 104 S.Ct. 1211, 1217–18, 79 L.Ed.2d 516 (1984).

As noted above, the conference committee adopted the House version of section 453. Plaintiff argues that the statements of three different representatives reflect that section 453 preempted all state laws regarding campaign financing. First, Representative Frenzel characterized the amendment as "a welcome change which will ensure that election laws are consistent and uniform and that candidates for federal office do not bear the burden of complying with several different sets of laws and regulations." Pls.' Mem. at 12 (quoting H.R.Conf.Rep. No. 1438, 93d Cong., 2d Sess. (1974)). Representative Frenzel recognized that the chief problem sought to be addressed was overlapping state and federal reporting requirements; apparently, many representatives wanted to be bound only by federal requirements. *Id.* (quoting 120 Cong.Rec. 7895 at 96 (1974)). Second, Representative Koch commented that the preemption provision, in the interests of uniformity, should be interpreted broadly. H.R.Conf.Rep. No. 1438, 93d Cong., 2d Sess. (1974). According to Koch, complete preemption is essential because all national legislators should be subject to the same campaign rules. *Id.*

Finally, plaintiffs submit the statements of Representative Hayes, the chair of the House committee that reported the bill. Statements by the chair of the committee in charge of a bill are regarded as being like supplemental committee reports, because the chair has the duty of defending the bill on the legislative floor and is presumed to have familiarized himself with its terms and its potential effect. 2A Singer, *supra* § 48.14, at 361. These statements should therefore be accorded the same weight as formal committee reports. *City*

of Kansas City v. Federal Pac. Elec. Co., 310 F.2d 271, 280 (8th Cir.), *cert. denied,* 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962); *accord Kuehner v. Heckler,* 778 F.2d 152, 160 (3d Cir.1985). In response to a proposed amendment that would have allowed states to set different expenditure levels than those in place at the federal level, Hayes, disapproving of the amendment, suggested that allowing states to impose lower spending limits would undercut the preemption provision. Pls.' Mem. at 13. This amendment, which would have clearly circumscribed the scope of the preemption provision, was eventually rejected.

Defendants and amicus muster their own statements from the legislative debates in response. First, Representative Obey, who proposed the amendment that would have allowed states to set different expenditure limits, believed that the preemption provision as it stood applied only to state reporting requirements, nothing more. Defs.' Mem. at 16 (quoting *See* 120 Cong.Rec. 7894 (Aug. 8, 1974), *reprinted in Legislative History of Federal Campaign Act Amendments of 1974* at 866 (1977)). In addition, Representative Hayes, in opposing the amendment, advanced the view that Congress should occupy the field of federal elections, Defs.' Mem. at 16 (quoting 120 Cong.Rec. 7894 at 867), but believed that states could encourage voluntary expenditure limits in spite of complete preemption. Id. According to amicus, the legislative debate, taken as a whole, suggests only that Congress did not intend to saddle federal candidates with inconsistent state reporting and disclosure requirements.

The Court believes that two propositions may be extracted from the legislative debates and, in particular, Representative Hayes' statements. It seems clear that the House defeated an amendment that would have permitted the states to set their own federal campaign spending limits. One could infer from this that the preemption provision, as it stands, was intended to preclude the states from regulating federal campaign spending. *Cf. Tahoe Regional Planning Agency v. McKay,* 769 F.2d 534, 538 (9th Cir.1985) (the rejection of ·an amendment generally indicates that the

legislature does not intend the bill to include the provisions embodied in the rejected amendment). However, this does not answer the question of whether candidates could voluntarily limit their own spending pursuant to a state statutory scheme. Put another way, while the individual members may have believed that state laws imposing mandatory spending limits were preempted, the record is silent as to whether states could enact a scheme of public financing based, in part, on the candidate's own agreement to limit spending. The second general proposition is that while the individual members may have believed that the preemption provision should be interpreted broadly, their central concern seemed to be possible inconsistent state and federal reporting and disclosure requirements. These two propositions cut against preemption.

### 3. *Agency Interpretation*

The second category of extrinsic evidence offered by the parties is the Federal Election Commission's interpretation of both FECA generally, through its own regulations, as well as its particular effect on the·Campaign Reform Act, through an advisory opinion.

#### a. *Regulation: 11 C.F.R. § 108.7*

Pursuant to its statutory authority, the commission promulgated 11 C.F.R. § 108.7 to implement FECA's preemption provision. Section 108.7 provides:

(b) Federal law supersedes State law concerning the—

(1) Organization and registration of political committees supporting Federal candidates;

(2) Disclosure of receipts and expenditures by Federal candidates and political committees; and

(3) Limitation on contributions and expenditures regarding Federal candidates and political committees.

(c) The Act does not supersede State laws which provide for the—

(1) Manner of qualifying as a candidate or political party organization;

(2) Dates and places of elections;

(3) Voter registration;

(4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses; or

(5) Candidate's personal financial disclosure.

11 C.F.R. § 108.7. In accordance with 2 U.S.C. § 438(d), which governs the procedures that the FEC must follow when promulgating rules, the FEC submitted this regulation to Congress in 1977. Congress did not disapprove the regulation, and it went into effect on April 13, 1977.

It is well-established that a federal agency, acting within the scope of its congressionally delegated authority, may enact regulations preempting state law. *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698–99, 104 S.Ct. 2694, 2699–700, 81 L.Ed.2d 580 (1984); *Fidelity Fed. Sav. & Loan v. de la Cuesta*, 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982); *Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274, 282 (1st Cir. 1990). An argument could be made that, under the circumstances here, this regulation on its own preempts the Campaign Reform Act. The language of section 108.7(b)(3) is sweeping, suggesting that any state law regulating spending is superseded by federal law.

 The Court finds that this regulation is probably the most persuasive evidence that section 453 was intended to preempt all state laws purporting to regulate congressional campaign expenditures. Before prescribing any regulations, the Federal Election Commission must transfer the proposed rule and an accompanying statement to the Senate and the House. If neither house disapproves the proposed regulation within thirty days, the commission may issue it. *See* 2 U.S.C. § 438(d); *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 34 n. 8, 102 S.Ct. 38, 43 n. 8, 70 L.Ed.2d 23 (1981). Thus, Congress has the opportunity to reject any regulations that it desires. The commission submitted its regulation interpreting the preemption provision in 1977; Congress did not reject it. Thus, the Court infers that this regulation, because it was tacitly approved by Congress, represents a valid interpretation of congressional intent.

#### b. Advisory Opinion

The final piece of extrinsic evidence submitted by the parties is a particular advisory opinion. At the request of plaintiffs' counsel, the Federal Election Commission issued an advisory opinion on October 7, 1991, in which the commissioners unanimously concluded that section 453 clearly preempts the Campaign Reform Act in its entirety. *See* Pls.' Mem.Ex. A (Federal Election Commission, advisory opinion 1991–22, Oct. 7, 1991) [hereinafter Advisory Opinion].

After discussing the relevant provisions of the Campaign Reform Act, the commission identified the question presented: "Does the FECA preempt and supersede a statute that permits payment of state funds to Federal candidates who enter voluntary, binding agreements to limit their campaign expenditures which are made enforceable via civil fines in amounts up to 400% of excessive expenditures." Advisory Opinion at 4. In answering this question, the commission first noted that section 453 and the rules promulgated thereunder preempt "any provision of State law with respect to election to Federal office." *Id.* (quoting 2 U.S.C. § 453). The commission then turned to the legislative history. Relying on the House committee report, *see* H.R.Rep. No. 1239, 93d Cong., 2d Sess. (1974) and the conference committee report, *see* Conf.Rep. No. 1438, 93d Cong., 2d Sess., both of which have been discussed *supra*, the commission observed that section 453 was intended to have a broad scope, including preempting criminal sanctions relating to limitations on campaign expenditures and all state reporting and disclosure requirements. Advisory Opinion at 4.

Next, the commission looked at its own regulations. Specifically, the commission found that 11 C.F.R. § 108.7, promulgated in order to further define section 453, expressly preempts state law regarding the limitations on contributions and expendi-

tures that apply to federal candidates and their committees. Advisory Opinion at 4. The regulations also draw a distinction between federal matters such as the limitation on expenditures, which are preempted, and state matters such as the manner of qualifying candidates, which are not. *Id.*

The commission then turned to the evolution of FECA. The 1974 amendments to FECA prescribed limits on expenditures by all federal candidates, whether presidential or congressional. Pub.L. No. 93–443, § 101(a), 88 Stat. 1264 (1974). However, because the Supreme Court declared these provisions unconstitutional in *Buckley*, Congress promptly repealed the expenditure limits for congressional candidates. *See* Pub.L. No. 94–283, § 112, 90 Stat. 488 (1976). After these amendments were repealed, the commission promulgated 11 C.F.R. § 108.7(a)(3), which, as noted above, prescribes that federal law supersedes state law concerning any limitation on expenditures regarding federal candidates and political committees. Advisory Opinion at 5. Finally, since that time Congress has considered the issue of expenditure limits and has, up to this point, chosen to enact such limits only for federally funded presidential candidates.[8] Based upon this evolution, the commission commented on the scope of federal preemption:

> This status of the Federal law does not suggest the presence of a regulatory vacuum into which the states may enter. It is instead indicative that Federal law continues to occupy the field with respect to enforcement of expenditure limits and, further, that the will of Congress at this time is that there be no expenditure limits for Federal candidates, other than for presidential candidates who qualify for U.S. Treasury funding.

Advisory Opinion at 6 (footnote omitted).

Finally, in evaluating the public funding mechanism created by the Campaign Reform Act, the commission looked to some of its own previous advisory opinions. In these opinions, the commission took the position that as a general rule, funds from state revenues may be deposited in a state party's federal account. Advisory Opinion at 6–7 (citing Advisory Opinions 1991–14; 1988–33; 1983–15; 1982–17; 1980–103; 1978–9). However, the commission distinguished the scheme established under the Campaign Reform Act. According to the commission, the fact that a state may deposit money in a party committee's federal campaign account was not the same as permitting a state to "regulate Federal campaign finance under the guise of a public funding mechanism conditioned on abiding by spending limits." Advisory Opinion at 7.

Based upon the statutory language, the legislative history, the evolution of the statute, its own regulations, and its past advisory opinions, the commission concluded that federal law preempted the Campaign Reform Act in its entirety:

> The Minnesota statute not only purports to provide funds directly to Federal candidates, but also purports to enforce a limit on expenditures made by Federal candidates. This statutory scheme ... is clearly preempted by the Act's express preemption provisions and the Commission's regulations....

Advisory Opinion at 7. The commission reasoned that the Campaign Reform Act was not like those state laws that Congress excluded from preemption, such as those prohibiting false registration, voter fraud, ballot theft and similar offenses, *see* Conf. Rep. No. 1438, 93d Cong., 2d Sess. (1974), but rather was more like a New Hampshire statute that restricted a political party's spending authority on behalf of federal candidates, which the commission found preempted. Advisory Opinion at 7 (citing Advisory Opinion 1989–25). According to the commission, statutes that regulate campaign spending, regardless of whether they

---

**8.** Both houses of Congress passed bills this term that would have established voluntary expenditure limits and provided partial financing for congressional races. *See* S. 3, 102d Cong., 2d Sess. (1992); H.R. 3750, 102d Cong., 2d Sess. (1992). After a conference committee resolved the difference between the two bills, the President vetoed the final version. Congress failed to override the veto. Amicus acknowledges that had this been enacted, it would have preempted the Campaign Reform Act. Mem. of Amicus Curiae at 4 n. 1.

are voluntary, are preempted. *See* Advisory Opinion at 7. In sum, the commission concluded that federal law preempted the Campaign Reform Act in its entirety.

At the outset, the parties dispute the extent to which the Court should defer to this agency interpretation. Plaintiffs contend that the Court should afford the advisory opinion great weight, because the Federal Election Commission, as the agency charged with primary and substantial responsibility for administering FECA, is presumed to be most familiar with its provisions. *See Democratic Senatorial Campaign Comm.*, 454 U.S. at 37, 102 S.Ct. at 44–45 (citations omitted). On the other hand, defendants and amicus argue that the advisory opinion should be given no deference whatsoever, chiefly because the commission allegedly misconstrued section 453's legislative history.[9] Amicus also argues that the Court should not defer to the agency interpretation because the scope of section 453 is inextricably linked with the extent of the FEC's own authority. According to amicus, courts should defer only reluctantly to an agency's view when that position would enlarge the scope of the agency's own power.

The question, then, is the proper deference to be afforded the commission's interpretation. According to the Supreme Court, judicial deference to reasonable agency interpretations of statutes that the agency administers is a dominant, well-settled principal of federal law. *Pauley v. BethEnergy Mines, Inc.*, —— U.S. ——, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991); *K–Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d

313 (1988); *Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the agency interpretation at issue is that of a statute, reviewing courts must first determine whether the statute at issue is ambiguous. If the language of the statute is clear, the court, as well as the agency, must give effect to the statute. *K–Mart Corp.*, 108 S.Ct. at 1817. Courts will not defer to an agency interpretation that flies in the face of the clearly expressed intent of Congress. *Board of Governors, FRS v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685–86, 88 L.Ed.2d 691 (1986). On the other hand, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," *Chevron, U.S.A.*, 467 U.S. at 843, 104 S.Ct. at 2782, in light of the structure and language of the statute as a whole. *See Sullivan v. Everhart*, 494 U.S. 83, 88, 110 S.Ct. 960, 963–64, 108 L.Ed.2d 72 (1990). Put another way, if the text of the statute is subject to differing interpretations, the court can reject the agency's interpretation only if it is unreasonable. *See National R.R. Passenger Corp. v. Boston & Maine Corp.*, —— U.S. ——, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992); *Emerson v. Steffen*, 959 F.2d 119, 121 (8th Cir.1992). Where a court reviews an agency's interpretation of its own regulations, however, an even higher degree of deference is owed. *Creighton Omaha Regional Health Care Corp. v. Sullivan*, 950 F.2d 563, 565 (8th Cir.1991).

**9.** In a footnote, defendants also argue that the Advisory Opinion is not binding essentially because it exceeds the commission's authority. Federal Election Commission advisory opinions are binding in the sense that they may be relied upon affirmatively by any person involved in the specific transaction or activity discussed in the opinion or in any materially indistinguishable transaction or activity. *United States Defense Comm. v. Federal Election Comm'n*, 861 F.2d 765, 771 (2d Cir.1988). According to the defendants, the Advisory Opinion at issue in this case was requested to enable plaintiffs to decide whether or not they should participate in the new Minnesota campaign finance system, and

how they should conduct their campaigns if candidates who will challenge them in the 1992 general election make a different decision. Defs.' Mem. at 12 n. 4 (citing Advisory Opinion at 2). This, defendants claim, was not a specific transaction or activity, and therefore the advisory opinion is not binding on anyone.

The Court finds this argument unpersuasive. The activity at issue, which is clearly within the scope of the Federal Election Commission's authority, is running for congressional office. The Advisory Opinion addresses the effect of a state law on the federal election process. This falls within the commission's authority.

In this case, the Court has already concluded that the language of section 453 is ambiguous. Under *Chevron* and its progeny then, the next question is whether the agency's interpretation is permissible, or, in other words, reasonable. In answering this question, the Supreme Court has over the years considered numerous factors, including: whether the agency has maintained its position consistently, even if infrequently, *see Haig v. Agee*, 453 U.S. 280, 293, 101 S.Ct. 2766, 2777–78, 69 L.Ed.2d 640 (1981); whether the agency interpretation is of longstanding application, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); whether the public has relied upon the interpretation, *see Udall v. Tallman*, 380 U.S. 1, 18, 85 S.Ct. 792, 802, 13 L.Ed.2d 616 (1965); whether the interpretation involves a matter of public controversy, *see United States v. Rutherford*, 442 U.S. 544, 545, 99 S.Ct. 2470, 2472, 61 L.Ed.2d 68 (1979); whether the interpretation is based upon agency expertise in a complex area, *see Aluminum Co. of Am. v. Central Lincoln People's Util. Dist.*, 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984); whether the agency has rulemaking authority, *see FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 793, 98 S.Ct. 2096, 2111, 56 L.Ed.2d 697 (1978); whether Congress knew of the agency interpretation and failed to repudiate it, *see Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965); whether the agency has expressly addressed the application of the statute to the proposed issue, *see Investment Co. Inst. v. Camp*, 401 U.S. 617, 627–28, 91 S.Ct. 1091, 1097–98, 28 L.Ed.2d 367 (1971); and the thoroughness, validity, and consistency of the agency's reasoning, *see Democratic Senatorial Campaign Comm.*, 454 U.S. at 37, 102 S.Ct. at 44–45. *See generally* Diver, *Statutory Interpretation in the Administrative State*, 133 U.Pa.L.Rev. 549, 562 n. 95 (1985) (presenting a list of the factors cited by the Supreme Court in considering whether to defer to agency interpretations).

Although the defendants and amicus do not expressly claim that the commission's interpretation is either impermissible or un-reasonable, they vigorously disagree with it, claiming that the commission misconstrued the statute's legislative history. In support of this position, they cite the same portions of the legislative record set out and discussed above. As the Court has noted, the legislative history is too ambiguous to support either side's interpretation conclusively. Defendants and amicus go further, however, claiming that the actual regulation, 11 C.F.R. § 108.7, though duly promulgated, should also be disregarded because the commission misconstrued section 453's legislative history. However, this argument ignores the fact that both houses of Congress had the opportunity to block the issuance of this regulation, yet neither house did. It does not make sense to reject a duly prescribed agency regulation merely because FECA's preemption provision is ambiguous.

The Court finds that deference to the Commission's interpretation is warranted in this case. First, as the Supreme Court noted in *Democratic Senatorial Campaign Comm.*, the commission "is precisely the type of agency to which deference should presumptively be afforded." 454 U.S. at 37, 102 S.Ct. at 44–45. Congress vested the agency with plenary authority, both rulemaking and adjudicative, to regulate the conduct of federal elections. Further, the commission was charged with formulating a "general policy with respect to the administration" of FECA. *Id.* Determining the scope of preemption appears to fall within the competence of the commission in light of its administrative responsibilities. Because of section 453's ambiguous statutory language and legislative history, the agency could easily come to the conclusion that Congress intended to preclude all aspects of federal election financing, even statutory schemes purporting to be voluntary. Moreover, the eight-member commission consists of six voting members, no more than three of which can be of the same political party. *See* 2 U.S.C. § 437c(a)(1). This inherent bipartisan composition further justifies deferring to the unanimous advisory opinion.

In addition, the commission, in considering whether FECA preempted the Campaign Reform Act, had the perspectives of all parties before it. Although plaintiffs were the ones who requested the Advisory Opinion, they were not the only ones who submitted information to the commission. As defendants acknowledge, the authors of the Campaign Reform Act, Senator William P. Luther and Representative Linda Scheid, both submitted comments to the commission arguing why their law should not be found to be preempted. Aff. of John Tunheim, Exs. A, B. In addition, United States Representative Bruce Vento also submitted a letter to the commission, urging it not to find the Campaign Reform Act preempted. Tunheim Aff. Ex. C. These statements by the proponents of the Campaign Reform Act are very thorough. The commission was thus given ample opportunity to carefully review all sides of this issue. *See Sioux Valley Hosp. v. Bowen,* 792 F.2d 715, 719 (8th Cir.1986).

Although defendants and amicus argue in part that the commission's interpretation is wrong because it fails to take into account that compliance with the Minnesota statute is voluntary, the Court finds this argument unpersuasive. First, and most importantly, the agency could reasonably conclude, as it did, that federal law occupied the field as to federal election financing, leaving no room for the states to experiment with their own, even "voluntary," systems.

Second, the Court believes that there is a distinction in kind between the statute at issue in this case and the type of state law, according to the statute, the regulation, and the legislative history, that was not intended to be preempted. Both the legislative history cited by the parties and the

agency regulation reflect that federal law was to govern certain aspects of the federal election process, and state law, other aspects. These state law aspects—in particular, candidate qualifications, date and places of elections, voter registration, and prohibiting voting fraud and similar offenses—seem to fall in the category of regulating the conduct of federal elections. Congress, not the states, has historically been the sole regulator of federal campaigns, as evidenced by the Tillman Act, the Corrupt Practices Act, the Smith–Connally Act, the Hatch Act and the Taft–Hartley Act. The Campaign Reform Act prescribes a system of public financing and voluntary expenditure limitations, thus purporting to regulate federal campaigns. This state system seems to encroach on those aspects of the federal election process that federal law was intended to govern.

In sum, the Court finds that the commission's interpretation of section 453 is reasonable. The Court will therefore defer to this interpretation and find that federal law occupies the field of congressional campaign financing, precluding state efforts to impose even voluntary financing systems. Accordingly, the Court will hold that the Minnesota Campaign Reform Act is preempted in its entirety.[10]

## II. Whether the Campaign Reform Act Violates Plaintiffs' Constitutional Rights

■ Plaintiffs allege that the Campaign Reform Act violates their First and Fourteenth Amendment rights. In order to make out a First Amendment claim, the plaintiffs must first show that the Act infringes upon protected expressive conduct. *Austin v. Michigan Chamber of Com-*

---

**10.** The defendants argue that even though the provisions of the Campaign Reform Act are closely tied together, the Court, if it finds the expenditure limitations preempted, should save the public funding provision in accordance with the express severability provision in the Act. *See* 1990 Minn.Laws ch. 608, art. 4, § 13. Although the Court must save as much of the statute as possible, *Immigration & Naturalization Serv. v. Chadha,* 462 U.S. 919, 931–932, 103 S.Ct. 2764, 2773–74, 77 L.Ed.2d 317 (1983), the

Court finds that the provisions of the Act are so intertwined that even if the public funding provisions were not preempted, they could not stand on their own without the preempted expenditure limitations. More importantly, however, the Court finds that the Campaign Reform Act is preempted in its entirety.

The Court's conclusion that the Campaign Reform Act is preempted obviates the need to determine whether there is an actual conflict between state law and federal law.

*merce,* 494 U.S. 652, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3068–69, n. 5, 82 L.Ed.2d 221 (1984). If the statute does restrict protected conduct, the defendants must show that the statute is narrowly tailored to serve a compelling interest. *Austin,* 110 S.Ct. at 1396.

In this case the plaintiffs have failed to meet the first part of the test. Although expenditure limitations may in certain instances implicate First Amendment freedoms, *Buckley,* 424 U.S. at 19, 96 S.Ct. at 634–35, the Campaign Reform Act merely conditions public funding upon a candidate's voluntary agreement to abide by expenditure limitations. Nothing prevents candidates from seeking private, instead of public, funding. The First Amendment is not implicated where candidates remain free to choose between funding alternatives. *Republican Nat'l Comm. v. Federal Election Comm'n,* 487 F.Supp. 280, 285 (S.D.N.Y.) (three-judge court), *aff'd,* 616 F.2d 1 (2d Cir.), *aff'd,* 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) (quoting *Buckley,* 424 U.S. at 57 n. 65, 96 S.Ct. at 653 n. 65). Therefore, the Court rejects plaintiffs' First Amendment challenge to the statute.

Plaintiffs also argue that the Campaign Reform Act infringes their rights under the Privileges or Immunities Clause of the Fourteenth Amendment. To make out a claim under this clause, the plaintiffs must show that the right asserted is specifically granted or secured to all citizens or persons by the United States Constitution. *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 18–19, 53 L.Ed. 97 (1908). Second, they must show that the Campaign Reform Act actually impairs that right. *Id.* at 90, 29 S.Ct. at 16.

In this case the plaintiffs have failed to assert a right specifically granted by the federal constitution. They assert that the Fourteenth Amendment protects their rights to be candidates for congressional office. However, the right to run for public office, unlike the right to vote, is simply not a fundamental right. *See Stiles v.*

*Blunt,* 912 F.2d 260, 265 (8th Cir.1990) (citing *Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972)). Because plaintiffs have failed to meet the first part of the test under the Privileges or Immunities Clause, the Court rejects plaintiffs' Fourteenth Amendment challenge to the Campaign Reform Act.

Accordingly, based upon the foregoing, and upon all the files and proceedings herein,

IT IS ORDERED that:

1. plaintiffs' motion for summary judgment that the Minnesota Campaign Reform Act, Minn.Stat. §§ 10A.40–51 is preempted by federal law is granted; and

2. the defendants and their agents are hereby permanently enjoined from implementing and enforcing the Minnesota Campaign Reform Act, Minn.Stat. §§ 10A.40-51.

LET JUDGMENT BE ENTERED ACCORDINGLY.